# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 1, 2011

## STATE OF TENNESSEE v. PRINCETON MOODY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-06207     John T. Fowlkes, Jr., Judge**

---

**No. W2011-00376-CCA-R3-CD  - Filed March 30, 2012**

---

The defendant, Princeton Moody, was convicted in the Shelby County Criminal Court of second degree murder, a Class A felony; aggravated assault, a Class C felony; and reckless endangerment, a Class E felony.  The trial court subsequently sentenced the defendant as a Range II offender to twenty years at 100 percent for the second degree murder conviction, eight years at thirty-five percent for the aggravated assault conviction, and eleven months, twenty-nine days for the reckless endangerment conviction, with the murder and aggravated assault sentences to be served consecutively to each other, for a total effective sentence of twenty-eight years in the Department of Correction.  On appeal, the defendant challenges the sufficiency of the evidence in support of his second degree murder conviction and argues that the trial court erred by admitting a hearsay statement as an excited utterance, in ruling that the State could impeach his testimony with his prior convictions for reckless endangerment, in admitting the victim's medical records, and in allowing the medical examiner to testify with respect to an autopsy report that she did not create.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Larry E. Fitzgerald (on appeal); William Massey and Lorna McClusky (at trial), Memphis, Tennessee, for the appellant, Princeton Moody.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Fleming and Garland Erguden, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the November 1, 2008 shooting death of Clarence Caldwell, which occurred at a Memphis home recording studio after Caldwell confronted the defendant about his having just punched a young woman, Kendria Allen, in the face. The defendant reacted by pulling a gun on Caldwell and threatening to kill him. A struggle ensued, during which Caldwell was eventually shot. Afterwards, the defendant threatened Allen and her young son with the gun before fleeing the scene. Caldwell died approximately thirty-six hours later.

The State's first witness at the defendant's October 2010 trial was Reverend Willie Caldwell, the murdered victim's father, who identified a photograph of his son and testified that he was twenty-five years old at the time of his death. On cross-examination, he estimated that the victim was approximately six feet, one inch tall and 150 to 160 pounds.

Kendria Allen testified that on November 1, 2008, Maurice Moody, who had a recording studio in his Memphis home that she had used twice before, invited her to return to his home to finish recording a song. She explained that the defendant, who was Moody's brother, had made her uncomfortable by making advances toward her during her second recording session and that she made sure that he was not there before agreeing to return for the November 1 session. She said that Maurice Moody was the only one present when she arrived at his home with her three-year-old son, Roderick, but that three additional men, "J-Rock," "Raw," and "Twin," whose real name she later learned was Clarence Caldwell, came to the home as she was working on her song. She was having difficulty composing the lyrics and, although she had never met Caldwell before that day, she asked if he would be willing to help her. He agreed, and the two of them went to the kitchen for about twenty minutes to work on the lyrics together. During that time, the defendant, who was accompanied by a young woman, arrived at the home.

Allen testified that while she was still in the kitchen, one of the young men came out of the studio room and told her that the defendant wanted her. She told him to tell the defendant no and remained in the kitchen with the victim. A little later, she started back to the studio and the defendant met her at the door and asked for a hug. She refused and continued into the studio to work on the recording.

Allen testified that as she began recording, everyone was in the recording studio area of the house with her, with the exception of the young woman, who was in the living room. She said that the music was low and that she was able to hear the conversation around her,

despite the fact that she was wearing earphones. She stated that she overheard the defendant ask his brother, Maurice Moody, where the gun was and Maurice Moody reply that it was in the closet. Maurice Moody then took a gun out of the closet and gave it to the defendant, who placed it in his waistband. She continued working on her song and had just reached a part with the words, "whoa, whoa, whoa," when she overheard the defendant say, "Don't nobody want to hear that whoa, whoa, whoa, shit."

Allen testified that she slid her earphones off and asked the defendant, "What did you say?" When she did so, the defendant came toward her and punched her in the nose with his fist. The victim then stood up, pushed her aside, and confronted the defendant, saying in a "low" and "calm" voice, "You shouldn't hit her, why you hit a female like that, you shouldn't hit a female like that, man." At that point, the defendant brandished his gun at the victim, saying to him, "Bitch, shut up, or I'll kill you, too."

Allen testified that as the defendant stood pointing his gun at the victim, her young son was beside the defendant "swinging and . . . fighting for his momma." She said she grabbed him, took him to the corner, and shielded his body with her own. In the meantime, she saw the victim struggling to get the gun from the defendant and heard the defendant cursing the victim. The struggle moved to the hallway, and she heard the sound of loud "tussling," followed by the "pow" of a gunshot. Next, the victim stumbled back into the room with the left side of his body bleeding, fell over against the wall, and then sat there appearing to be in a state of shock. A few seconds later, the defendant came into the room, pointed his gun at her and her son, called her a "bitch," threatened to kill her, and struck her in the face again. A few seconds later, Maurice Moody came into the room and began pulling the defendant away from her as he said, "Don't do it, Bro, don't do it Bro, she got kids. Don't do it, Bro."

Allen testified that the angry defendant appeared reluctant to leave but that he eventually allowed his brother to move him away from her and out of the room. After waiting a few minutes, she took her son and exited the house, hurrying toward her car in an effort to get away. As she did so, the defendant, who was outside beside his car, looked at her and said, "If you say anything, I'll kill you and him." She then got into her car with her son and began driving away, checking in her rearview mirror to make sure that the defendant, who had gotten into his own vehicle, was not following her.

Allen testified that she began searching for her cell phone, realized she had left it in the recording studio, and returned to Moody's house to retrieve it. The victim, who was still sitting on the floor of the studio in an apparent state of shock, moved slightly when she was leaving the room and repeated several times that he was getting weak. She, therefore, began screaming that they needed an ambulance and ran to the front porch of the home, where

Maurice Moody and "J-Rock" were standing. She told the men they needed to call the police and Moody responded, "We're going to have to get Bro up out of my house, man, we going to have to get Bro up out of my house."

On cross-examination, Allen testified that the defendant's brother joined in the struggle between the defendant and the victim over the gun. On redirect examination, she testified that she heard Maurice Moody call out, "Don't shoot him, Bro," after the struggle moved into the hall and before she heard the gunshot.

Kenjerica Littles, who was the defendant's girlfriend at the time of the shooting, testified that she met the defendant at his brother's house that night, where the couple spent an hour or two talking together in the living room. She said that they had plans to attend a homecoming game and that the defendant had gone to get his coat in preparation for their departure when she heard him arguing and swearing at Allen in the back room. When she went to look, she saw the defendant and Allen walk toward each other, Allen push the defendant, and the defendant strike Allen in the face with his fist. At that point, the victim and the defendant's brother intervened, both telling the defendant that he should not hit a woman and attempting to calm him down.

Littles said that the defendant pulled his gun up as the victim walked toward him and that Maurice Moody told him, "[N]o, don't do this," as Moody and the victim began grappling with the defendant for the gun. The gun was "waving back and forth," as the men were "tussling," and she watched from the hallway until the defendant told her to move. As she left the hallway, she heard the gun discharge. She then went back to see the defendant walk toward the victim, who was lying against the wall, and raise his gun over his head as if about to strike the victim with it. Littles said she turned her head at that point but heard what sounded like the gun making contact with the victim. During that time, the defendant's brother was arguing with the defendant and telling him not to do it.

Sergeant Joel Bird of the Memphis Police Department identified photographs of the crime scene, which showed overturned furniture and blood spatter in the bedroom/studio area and a large indentation in the hallway wall.

Shelby County Chief Medical Examiner Dr. Karen Chancellor, who was accepted by the court as an expert witness in the field of forensic pathology, testified that the victim's autopsy was performed by Dr. Lisa Funte, an assistant pathologist in her office who was currently out of the state. She said that she had thoroughly reviewed the autopsy report and body diagram that had been prepared by Dr. Funte, as well as the victim's toxicology report and the autopsy photographs, and that she was testifying as the keeper of the records. She stated that Dr. Funte concluded, and she agreed from her review of the record, that the victim

-4-

died of a gunshot wound to the abdomen in which the bullet entered the left side of the torso and exited on the right side of the torso. She further testified that the autopsy photographs showed that he had an abrasion on the upper back, an abrasion on his right cheek, and a contusion on his forehead. The victim's toxicology report revealed that the victim tested negative for the presence of drugs and alcohol. The autopsy photographs and body diagram were introduced as exhibits to the case during Dr. Chancellor's direct examination testimony, but the trial court sustained the defendant's hearsay objection to the introduction of the autopsy report itself.

On cross-examination, Dr. Chancellor testified that the autopsy report indicated that the victim was six feet, three inches tall and weighed 223 pounds. On redirect and recross examination, she testified that, at the time of his death, the victim was experiencing "anasarca,"or swelling of the body caused by an accumulation of fluids, which she estimated, based on her review of the autopsy photographs, could have added ten to fifteen pounds to his body weight.

As its final proof, the State introduced the victim's medical records relating to his treatment of the gunshot wound.

The defendant elected not to testify and rested his case without presenting any proof.

## ANALYSIS

### I. Admission of Maurice Moody's Statement, "Don't shoot him, Bro."

As his first issue, the defendant contends that the trial court erred by allowing Allen to testify that she overheard Moody call out, "Don't shoot him, Bro," as the struggle in the hallway was taking place. The defendant argues that, even if the statement was admissible under the excited utterance exception to the rule against hearsay, it should have been excluded under Tennessee Rule of Evidence 403 as unfairly prejudicial to his case.

A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Whether a challenged statement is hearsay is a question of law that is subject to *de novo* review. State v. Gilley, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S. W. 3d 703, 721 (Tenn. Ct. App. 2005)).

The trial court first ruled that the statement was not hearsay because it did not go to prove the truth of the matter asserted. The court then ruled that, even if hearsay, the

statement was admissible under the excited utterance exception to the rule against hearsay, which provides that an otherwise inadmissible hearsay statement is admissible if shown to be "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." See Tenn. R. Evid. 803(2).

Were we to determine that Moody's words constituted hearsay, we would have no hesitation in concluding that the events that were transpiring at the time he spoke were sufficiently startling to warrant admission of the statement as an excited utterance. However, commands, instructions, and questions often are not hearsay because they are not offered to prove the truth of their content. See State v. Lequire, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1981); State v. David Dwayne Smith, No. E2007-00084-CCA-R3-CD, 2009 WL 230696, at *24 (Tenn. Crim. App. Feb. 2, 2009), perm. to appeal denied (Tenn. Aug. 17, 2009) ("A command for the defendant to shoot the victim or a plea for the defendant not to harm the victim are clearly orders or commands not offered for the truth of the matter asserted.") (citing State v. Derek T. Payne, No. W2001-00532-CCA-R3-CD, 2002 WL 31624813 (Tenn. Crim. App. Nov. 20, 2002), perm. to appeal denied (Tenn. May 19, 2003); State v. Reginald S. Mabone, No. 02C01-9203-CR-00054, 1993 WL 270618, at *1 (Tenn. Crim. App. July 21, 1993), perm. to appeal denied (Tenn. Oct. 4, 1993)). Thus, this court has previously held that a declarant's instruction to a defendant of "don't shoot!" did not qualify as hearsay because it was not offered to prove the truth of the matter asserted. Payne, 2002 WL 31624813, at *10. In this case, we likewise conclude that Moody's command to his brother not to shoot the victim does not qualify as hearsay and, further, that the probative value of the evidence outweighed its prejudicial effect. Accordingly, we conclude that the trial court did not err by admitting the statement.

## II. Admissibility of Prior Convictions for Impeachment Purposes

The defendant next contends that the trial court erred by ruling that his testimony could be impeached with evidence of his prior convictions for reckless endangerment. The defendant argues that because reckless endangerment was a lesser-included offense to his indicted offense of second degree murder, the trial court should have found that the reckless endangerment convictions were too similar to the offenses for which he was on trial and, thus, unfairly prejudicial to his case.

A conviction may be used to impeach the testimony of an accused in a criminal prosecution if the following four conditions are satisfied: (1) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (2) less than ten years has elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (3) the State gives reasonable pretrial written notice of the

particular conviction or convictions it intends to use as impeachment; and (4) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. Tenn. R. Evid. 609; State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999).

Two factors should be considered when deciding whether the probative value of a prior conviction outweighs its unfair prejudicial effect. Mixon, 983 S.W.2d at 674. First, "[a] trial court should . . . analyze the relevance the impeaching conviction has to the issue of credibility." Id. (citation omitted). Second, if the trial court finds that the prior conviction is probative of the defendant's credibility, then the court should "'assess the similarity between the crime on trial and the crime underlying the impeaching conviction.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9 at 376 (3d ed. 1995)). The more similar the impeaching conviction is to the offense for which the defendant is on trial, the greater the risk of a prejudicial effect to the defendant. Id.

This court reviews a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. See State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003).

After listening to the argument at a jury-out hearing, the trial court noted that the defendant's reckless endangerment convictions fell within the relevant time frame and were not "closely related to any of the offenses" for which the defendant was on trial, all of which had different titles. The court, therefore, concluded that the probative value of the convictions was not outweighed by their prejudicial effect. We find no abuse of discretion in the trial court's ruling and, accordingly, conclude that the defendant is not entitled to relief on the basis of this issue.

### III. Admissibility of Medical Records

The defendant next contends that the trial court erred by allowing the victim's certified medical records to be introduced into evidence. Specifically, he argues that the medical records, which detailed the condition of the victim's body as it deteriorated in the hospital prior to his death, were irrelevant to any issue at trial because the State had already presented evidence that the victim's death resulted from his gunshot wound. He further argues that, even if relevant, the evidence should have been excluded under Rule 403 as unfairly prejudicial because "the only purpose it could serve would be to inflame the jury."

"A trial court's determination with respect to relevancy issues is reviewed under an abuse of discretion standard." See Gilley, 297 S.W.3d at 760 (citations omitted). Similarly, "Rule 403 decisions fall within the discretionary authority of the trial court and will not be

overturned absent an abuse of discretion." State v. Mitchell, 343 S.W.3d 381, 389 (Tenn. 2011).

"Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The trial court ruled that the medical records were "very relevant to what happened in the house, the injuries that were sustained, and the ultimate death of the victim." We find no abuse of discretion in the court's ruling on this matter. The medical records that were admitted consist of a one-page "coding summary" of the procedures performed on the victim, with the charges for the services blacked out at the trial court's orders, and a one-paragraph discharge summary that described the history of the case. We agree with the State that there is nothing inflammatory in the dry, clinical language used in the summary. We also agree that the evidence was relevant to show the victim's cause of death and to help the State prove that the defendant committed a knowing killing of the victim. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## IV. Testimony of Medical Examiner Who Did Not Perform Autopsy

The defendant next contends that allowing Dr. Chancellor to testify regarding the autopsy report, which was "evidence outside her own personal knowledge," constituted both a violation of the hearsay rule and a denial of his right of confrontation under the state and federal constitutions. The State responds by arguing, *inter alia*, that the defendant's confrontation rights were not violated because (1) autopsy reports fall within the realm of business records, which are non-testimonial in nature, and (2) most of Dr. Chancellor's testimony consisted of her own expert opinion based on her review of the autopsy record. In the alternative, the State argues that any error in allowing Dr. Chancellor to testify about the contents of the autopsy report was harmless beyond a reasonable doubt, as there was no dispute that the victim died as the result of a gunshot wound.

In Crawford v. Washington, 541 U.S. 36, 68-69 (2004), the United States Supreme Court held that testimonial hearsay statements violate a defendant's rights under the federal constitution's Confrontation Clause and are only admissible when the declarant is both unavailable and there was "a prior opportunity for cross-examination." Id. at 68. Hearsay is testimonial where it takes the form of "[a] solemn declaration or affirmation made for the

purpose of establishing or proving some fact" or of a statement "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52.

In Melendez-Diaz v. Massachusetts, ___U.S.___, 129 S. Ct. 2527 (2009), the Court applied Crawford to hold that a forensic laboratory report stating that a seized substance was cocaine constituted testimonial hearsay. The Court concluded:

> In short, under out decision in Crawford the analysts' affidavits were testimonial statements, and the analysts were "witnesses" for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to "'be confronted with'" the analysts at trial.

129 S. Ct. at 2532 (quoting Crawford, 541 U.S. at 54). The Court rejected the argument that the affidavits qualified as business records that were non-testimonial in nature: "Whether or not they qualify as business or official records, the analysts' statements here – prepared specifically for use at petitioner's trial – were testimony against the petitioner, and the analysts were subject to confrontation under the Sixth Amendment. Id. at 2540.

In Bullcoming v. New Mexico, __ U.S. __, 131 S. Ct. 2705 (2011), the Court held that "surrogate" testimony by a scientist who was familiar with the process of blood alcohol testing using a gas chromatograph machine, but who had not signed the certification or performed or observed the actual test, was insufficient to satisfy a defendant's Sixth Amendment right to confront witnesses against him. Id. at 2710. In her concurrence, Justice Sotomayor observed that the Court's opinion did not address other factual scenarios, including the case in which an expert witness is "asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." Id. at 2722-23 (Sotomayor, J. concurring).

In Nardi v. Pepe, 662 F.3d 107 (1st Cir. 2011), the First Circuit Court of Appeals was presented with a habeas corpus petition in which a petitioner alleged that his Sixth Amendment Confrontation Rights were violated by the fact that the medical examiner who testified at his trial was not the same as the one who performed the autopsy or prepared the autopsy report. Id. at 108-09. Although the court ultimately did not decide the issue of whether such a scenario violated the Confrontation Clause, it noted that there is a "long tradition . . . of allowing experts to rely on hearsay where it is common practice in the profession to rely upon such evidence" and that "[o]ne of the common examples is a testifying doctor who relies in part on medical tests or specialist reports." Id. at 112 (citations omitted).

In a recent case with a factual scenario similar to the case at bar, the Missouri Court of Appeals, noting the tradition of allowing an expert to base his or her opinion on reliable hearsay, concluded that the testimony of a medical examiner who did not perform an autopsy or prepare the autopsy report did not violate the Confrontation Clause because the expert offered his own opinions and conclusions on the cause of death and the autopsy report was not itself admitted into evidence. State v. Prentiss R. Fulton, Jr., No. WD71820, 2011 WL 6027952, at *4 (Mo. Ct. App. Dec. 6, 2011); see also State v. Leroy Jaramillo, No. 28, 517, 2011 WL 6965716, at *5 (N.M. Ct. App. Nov. 23, 2011) (distinguishing case in which medical examiner testifies about conclusions in another's autopsy report, which violates a defendant's right to confront witnesses against him, from one in which the medical examiner makes it clear he is testifying as to his own independent opinions).

In this case, we, likewise, conclude that Dr. Chancellor's testimony did not violate the Confrontation Clause because it primarily consisted of her own expert opinion based on her independent review of the autopsy photographs and autopsy report, which was not admitted into evidence. Furthermore, we agree with the State that, even if the testimony were admitted in error, the defendant suffered no prejudice, as the contested issue at trial was not the cause of the victim's death, but instead the manner in which the fatal wound was inflicted, *i.e.* whether the shooting occurred accidentally during the struggle that took place in the hallway. We conclude, therefore, that the defendant is not entitled to relief on the basis of this claim.

## V. Sufficiency of the Evidence

Lastly, the defendant challenges the sufficiency of the evidence in support of his second degree murder conviction. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain the conviction for second degree murder, the State had to prove beyond a reasonable doubt that the defendant committed a knowing killing of the victim. See Tenn. Code Ann. § 39-13-210(a)(1) (2010). Tennessee Code Annotated section 39-11-302(b) provides in pertinent part that "[a] person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b).

The defendant bases his argument on the insufficiency of the evidence on the fact that the jury asked the court if it could see the trial transcript in order to review at what point in the struggle Moody said, "Don't shoot him, Bro." The defendant asserts that the jury's request, which was denied by the trial court, demonstrates that the jury "was obviously confused regarding . . . whether [the shooting] was accidental or intentional" and that its verdict was, therefore, the result of speculation. We respectfully disagree. The evidence, which included testimony about the defendant's anger and threatening behavior and violence directed both toward the murder victim and Allen and her child, was sufficient for a rational jury reasonably to conclude that the defendant committed a knowing killing of the victim. We conclude, therefore, that the evidence was sufficient to sustain the defendant's conviction for second degree murder.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-11-