

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD75597 |
| | ) | |
| JEFFREY SCOTT SAUERBRY, | ) | **FILED:** November 12, 2014 |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County**
**The Honorable Roger M. Prokes, Judge**

**Before Division Two: Gary D. Witt, P.J., and Lisa White Hardwick and Alok Ahuja, JJ.**

Following a jury trial, Jeffery S. Sauerbry was convicted of first-degree murder in the Circuit Court of Jackson County. Sauerbry appeals. He claims that his constitutional right to confront the witnesses against him was violated when the court permitted a pathologist to testify to her opinions concerning the nature and cause of the victim's wounds, even though the testifying pathologist had not conducted the victim's autopsy. Sauerbry also challenges the trial court's refusal to permit him to impeach one of the State's principal witnesses with allegedly false testimony she had provided in a separate criminal proceeding involving her son, and with the amount of money the witness had spent in connection with her son's defense. We affirm.

## Factual Background

In July 1998, Sauerbry performed odd jobs at E&L Motors, a used car lot in Independence. In exchange, he was allowed to occasionally sleep at the lot. William Kellett had a similar arrangement with E&L Motors; he served as a night watchman in exchange for being

allowed to live in a travel trailer parked at the lot. The owner of E&L Motors, Earl Tharp, also lived at the lot. Sauerbry and Kellett had an acrimonious relationship.

On the night of July 3, 1998, Tharp left the lot at approximately 9:00 p.m. and did not return until sometime between 2:30 and 4:00 a.m. At approximately 9:00 a.m. on July 4, Tharp went to Kellett's trailer to use his phone. Tharp found the trailer locked and returned with a key. On entering the trailer, Tharp found Kellett's body.

Kellett had suffered twelve sharp-force injuries consisting of four stab wounds and eight incised wounds (wounds which were longer than their depth). The stab wounds were to Kellett's head and chest. The incised wounds were to his neck and hands. The wounds to his hands were consistent with defensive wounds. The Chief Medical Examiner of Jackson County, Dr. Mary Dudley, testified that a neck wound that went through to Kellett's vertebrae was fatal. Dr. Dudley testified that, although the deepest stab wound was five-and-one-quarter inches deep, it was consistent with a knife with a four-and-one-quarter inch blade that was recovered from Sauerbry.

Kellett also had a gunshot wound to the right side of his neck. Based on stippling on Kellett's skin, Dr. Dudley testified the shot was fired at an intermediate range. The bullet penetrated just inside the skin; although it tore some muscle and soft tissue, it did not hit any vital structures of the body. Dr. Dudley testified that the gunshot wound was "unusual," because "it didn't go very far"; she also testified that the gunshot wound was "consistent with a low velocity on th[e] bullet" that was recovered from Kellett's body.

At approximately 9:00 p.m. on July 3, Independence Police stopped a car carrying Sauerbry and two other persons. Sauerbry was sweating profusely and was jittery and nervous.

2

The other two occupants of the vehicle had outstanding warrants and were arrested. Sauerbry was allowed to leave on a bicycle that was in the trunk of the car.

The next morning, Sauerbry went to the home of a friend, John Wesley. Wesley was leaving to run errands and Sauerbry asked to join him. Sauerbry brought his backpack with him. When Wesley pulled his vehicle into the drive-through lane of a McDonald's restaurant, Sauerbry got out of the car with his backpack, walked inside a fenced area containing a waste dumpster, and returned to Wesley's car without the backpack. When Wesley asked Sauerbry why he had thrown the backpack away, Sauerbry stated that the woman he was living with was upset about his dirty clothes, so he had discarded them.

On July 5, Wesley and Sauerbry were watching television at Wesley's house. A news report came on about Kellett's murder. Sauerbry stood up, stated that "that guy was an asshole," and left the house. Wesley discussed the incident and the backpack with a neighbor, who contacted the police. The police conducted a search of the landfill where the McDonald's restaurant's trash was taken, but were unable to locate the backpack.

The police conducted a search of the basement where Sauerbry was staying at the time of the murder. The police recovered a knife and a .410-gauge shotgun with a sawed-off barrel. The shotgun was wet, and was wrapped in a plastic bag within a zippered bag. Initially, Sauerbry denied owning any weapons; when confronted with the weapons found in the search, he admitted they were his.

Sauerbry was questioned by police regarding his whereabouts on July 3 and 4. He denied involvement with Kellett's murder, and stated that he had not seen Kellett in several weeks. He also denied going anywhere with Wesley on July 4, and denied disposing of his backpack. Sauerbry stated that after the police stop of the vehicle in which he was a passenger on the

3

evening of July 3, he rode his bicycle to a liquor store, and then to the house in which he was staying. He then went to bed and did not wake up until noon on July 4. Although Sauerbry initially stated that he had stayed home all day on July 4, he later admitted to attending a party at Wesley's home that evening.

Diana Reno Huffman, the mother of one of Sauerbry's childhood friends, testified that Sauerbry had admitted to her that he had killed Kellett. Sauerbry stated that he and Kellett had been playing poker and that Kellett was "F-ing" with him. Sauerbry told Huffman that he left and then came back to the trailer with his shotgun. He went to the side of the trailer and made a noise. When Kellett looked out the window Sauerbry shot him in the face. Huffman testified that Sauerbry also told her about throwing away his backpack at the McDonald's restaurant. Huffman did not relay this confession to the police until 2009, eleven years later.

The initial forensic testing of the evidence collected from Kellett's trailer and Sauerbry's residence yielded no evidence to tie Sauerbry to the crime. The investigation stalled.

In 2007, nine years after Kellett's murder, the investigation was reopened, witnesses were reinterviewed, and the physical evidence was reexamined using new scientific techniques. This reinvestigation included taking the knife recovered from Sauerbry's residence to the medical examiner to determine if Kellett's wounds were consistent with the knife. As the medical examiner's suggestion, forensic examiners removed the knife's handle and found human blood and skin cells. The samples retrieved were insufficient to develop a genetic profile through DNA testing.

The .30-caliber bullet which had been recovered from Kellett's neck was also reexamined. Because it did not have any rifling marks, a firearms examiner determined that the bullet could have been fired from a smooth-bore firearm such as the .410-caliber shotgun

4

recovered from Sauerbry. The firearms examiner test-fired Sauerbry's shotgun using .30-caliber ammunition. Based on the stippling pattern that developed when firing Sauerbry's shotgun using .30-caliber ammunition from different distances, the examiner testified that the bullet that entered Kellett's neck would have been fired from a distance of twenty-four to thirty-seven inches. The examiner also testified that the .30-caliber bullets test-fired from Sauerbry's shotgun had a very low velocity on leaving the shotgun's barrel, and were not stable in flight; the examiner testified that this was consistent with the bullet being recovered just inside Kellett's neck, rather than traveling through his body.

The police spoke with Huffman in June of 2009. She stated that she was afraid of Sauerbry and did not want to be involved in the investigation beyond the original statement she had given to police in 1998. Nearly a month later, Huffman contacted police and told them that Sauerbry had admitted to her that he had killed Kellett. She also stated that sometime before the murder, Sauerbry had shown her the shotgun while at her house. Additionally, Huffman told police that one week prior to Kellett's death, Sauerbry had told her that he was going to kill Kellett, because he couldn't get away from Kellett in any other way.

As a result of the reopened investigation, Sauerbry was charged with first-degree murder. A jury found him guilty and the court sentenced him to life imprisonment without the possibility of parole. Sauerbry appeals.

**Analysis**

On appeal, Sauerbry claims the trial court erred in allowing Dr. Dudley to testify concerning the nature and potential causes of Kellett's wounds, because she did not perform Kellett's autopsy, but relied on the observations made by another pathologist during the autopsy as the basis for her opinions. Sauerbry also argues that the court erred in refusing to allow him to impeach Huffman with the allegedly false testimony she gave during her son's trial for murder in

5

an unrelated case, and with the amounts she had spent in connection with her son's criminal defense.

## I.

Sauerbry first argues that Dr. Dudley's testimony violated his rights under the Confrontation Clause contained in the Sixth Amendment to the United States Constitution, because her testimony relied on observations made by another pathologist who had performed Kellett's autopsy. We disagree.

Following Keller's murder, an autopsy was conducted by Jackson County Medical Examiner Dr. Sam Gulino. By the time of trial, Dr. Gulino had left the Jackson County Medical Examiner's Office, and was working as a medical examiner in Philadelphia. At trial, the State relied on the testimony of Dr. Dudley. Dr. Dudley became part of the investigation in 2007 when she examined the knife seized from Sauerbry's residence. Prior to her testimony she reviewed the entire file concerning Kellett's autopsy, including photographs taken during the autopsy, and the autopsy report prepared by Dr. Gulino. She then used these documents to form her opinions concerning the nature and potential causes of Kellett's injuries. Dr. Dudley testified that the materials she reviewed are reasonably relied upon by experts in her field.

Whether Dr. Dudley's testimony violates Sauerbry's rights under the Confrontation Clause is a legal issue which we review *de novo*. *State v. Fulton*, 353 S.W.3d 451, 455 (Mo. App. W.D. 2011) (quoting *State v. March*, 216 S.W.3d 663, 664-65 (Mo. banc 2007)).

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Supreme Court of the United States has held that the Confrontation Clause applies to certain out-of-court statements offered as evidence at trial, although "not all hearsay implicates the Sixth Amendment's core concerns." *Crawford v. Washington*, 541 U.S. 36, 51 (2004).

6

Under *Crawford*, criminal defendants generally have the right to confront and cross-examine any person whose "testimonial" statements are introduced as evidence, unless the individual is unavailable and the defendant has had a prior opportunity to cross-examine him or her. *Id.* at 51, 53-54.

"On a number of occasions this Court has addressed whether, in the wake of *Crawford . . .*, a medical examiner other than the one who performed an autopsy may testify to the results of the autopsy, or to opinions which rely on the results of the autopsy, and whether an autopsy report prepared by an absent medical examiner may itself be admitted into evidence." *State v. Dudley*, 303 S.W.3d 203, 208 (Mo. App. W.D. 2010). We have held that the Confrontation Clause prohibits the introduction into evidence of an autopsy report prepared by an absent medical examiner, and testimony concerning the opinions and conclusions reached by the absent examiner. *See*, *e.g.*, *State v. Bell*, 274 S.W.3d 592, 595-96 (Mo. App. W.D. 2009) ("Dr. Dudley's testimony, to the extent she discussed Dr. Gill's opinions, was error and violated Mr. Bell's Confrontation Clause rights."); *State v. Davidson*, 242 S.W.3d 409, 417 (Mo. App. E.D. 2007) (admission of autopsy report prepared by absent medical examiner, and testimony as to absent examiner's conclusions, violated Confrontation Clause).

In this case, however, neither the autopsy report prepared by Dr. Gulino, nor Dr. Gulino's conclusions as to cause of death or the cause of Kellett's injuries, were admitted into evidence. Instead, Dr. Dudley related the measurements and nature of Kellett's wounds, which were derived from her review of the autopsy file, as a basis for her opinions as to the cause of Kellett's death, and the nature and cause of the wounds he suffered. We recognize – as Sauerbry emphasizes – that Dr. Dudley's description of the nature of Kellett's wounds went beyond what was observable from the autopsy photographs themselves. Thus, Dr. Dudley's testimony

7

concerning the depth of various stab wounds and incisions, and her testimony concerning where the bullet in Kellett's neck was lodged, and the tissues it had damaged, were necessarily based on observations made by Dr. Gulino, not on the autopsy photographs. Dr. Dudley relied on these observations to prepare her own "wound chart," and to support her opinions that the knife recovered from Sauerbry's residence was consistent with Kellett's stab wounds, and that the bullet wound Kellett suffered in his neck was unusual, and was consistent with a projectile traveling at low velocity. The observations on which Dr. Dudley relied were presumably recorded in narrative form in Dr. Gulino's autopsy report and supporting documents (none of which have been included in the record on appeal). Nonetheless, Dr. Dudley specifically testified that the materials she reviewed in forming her opinions were the type of materials upon which experts in her field reasonably relied.

We have dealt with this specific situation – where a testifying examiner relates his or her *own* opinions, based on another medical examiner's observations during an autopsy – in several cases.

> The general conclusion reached in those cases is that the testifying [medical] examiner may properly testify to his or her *own* opinions and conclusions, even if relying upon the absent examiner's report, without violating the Confrontation Clause, so long as the testifying examiner does not discuss the absent examiner's opinions or conclusions, and the absent examiner's report is not admitted into evidence.

*State v. Fulton*, 353 S.W.3d 451, 455 (Mo. App. W.D. 2011) (citations omitted).

These cases hold that a testifying medical examiner may testify to opinions concerning the nature and cause of wounds, and the cause of a victim's death, even if those opinions were based not only on autopsy photographs, but also based on observations made by the absent examiner during the autopsy, as reflected in the absent examiner's report and notes; in addition, the testifying examiner may testify to factual information derived from the absent examiner's

8

notes and report, such as the number and size of wounds, if that information forms part of the basis for the expert's opinions. Thus, in *State v. Walkup*, 290 S.W.3d 764 (Mo. App. W.D. 2009), we held that Dr. Dudley could permissibly testify to a wound chart she had prepared based on her review of the complete autopsy file in another case, even if her information concerning the number and measurements of the victim's wounds were derived from an autopsy report which had not itself been admitted into evidence. We explained that

> the number and measurements of the wounds were factual information, not [the absent examiner]'s opinions. Dudley did not mentioned a conclusion drawn by [the absent examiner] or restate an opinion made by [the absent examiner], nor did the State attempt to introduce [the absent examiner]'s report. Rather, Dudley testified as a qualified expert to her own conclusions and opinions based upon her independent analysis of the factual information available to her.

*Id.* at 767; *see also Fulton*, 353 S.W.3d at 454 (testifying medical examiner relied on "the autopsy reports, photographs, x-rays, and the medical examiner's investigative file to reach his own independent conclusions as to the cause and manner of death"); *State v. Tillman*, 289 S.W.3d 282, 288 (Mo. App. W.D. 2009) (testifying medical examiner relied on autopsy photographs and "descriptions of the injuries" in autopsy report in arriving at her opinions concerning cause of death and cause of injuries); *State v. Haslett*, 283 S.W.3d 769, 777 (Mo. App. S.D. 2009) (testifying examiner based opinions on, *inter alia*, an autopsy report and "autopsy worksheets" prepared by absent examiner); *State v. Bell*, 274 S.W.3d 592, 595-96 (Mo. App. W.D. 2009).

Dr. Dudley's testimony in this case was permissible under *Fulton*, *Dudley*, and the other cases cited above. Sauerbry argues, however, that our prior decisions in this area should no longer be followed, because they are inconsistent with the decisions of the Supreme Court of the United States in *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), and in *Williams v. Illinois*, 132 S. Ct. 2221 (2012).

*Bullcoming* addressed "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification – made for the purpose of proving a particular fact[, a defendant's blood-alcohol concentration or "BAC"] – through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." 131 S. Ct. at 2710. *Bullcoming* held that the admission of a laboratory report prepared by an absent technician, to establish the defendant's BAC, violated the defendant's rights under the Confrontation Clause.

We held in *Fulton* that *Bullcoming* did not call into question our decisions holding that a testifying medical examiner may testify to his or her own opinions, even if those opinions are based on an autopsy conducted by an absent examiner. We explained that, in *Bullcoming*, the report prepared by the absent laboratory technician was actually admitted into evidence, while in cases like this one, the absent examiner's report, and the absent examiner's opinions, are not themselves put before the jury. 353 S.W.3d at 456-57. Moreover, *Bullcoming* stressed that the prosecution in that case "never asserted that the testifying analyst 'had any "independent opinion" concerning Bullcoming's BAC.'" *Id.* at 456 (quoting *Bullcoming*, 131 S. Ct. at 2716). Finally, *Fulton* noted that Justice Sotomayor emphasized in a separate concurring opinion that *Bullcoming* did not address "'a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence.'" *Id.* (quoting *Bullcoming*, 131 S. Ct. at 2722 (Sotomayor, J., concurring)).

For the reasons explained in *Fulton*, *Bullcoming* does not require us to reexamine the result we have reached in multiple cases raising Confrontation Clause claims like Sauerbry's. We reach the same conclusion with respect to *Williams*. In *Williams*, a woman was kidnapped, robbed, and raped, and vaginal swabs were collected as evidence and sent to a private laboratory

10

for development of a DNA profile. 132 S. Ct. at 2229 (plurality opinion). At trial, the prosecution presented expert witness testimony that the DNA profile developed from the swabs taken from the victim matched the defendant's DNA profile. *Id.* at 2229-30. The testifying expert was a state employee, and had not been involved in the private laboratory's development of the DNA profile from the victim's vaginal swab. *Id.* No technician from the private laboratory which analyzed the vaginal swab testified at trial, and the laboratory's report was not admitted into evidence, or quoted. *Id.* at 2230.

The defendant in *Williams* contended that his Confrontation Clause rights were violated when the trial court permitted the prosecution to introduce expert opinion testimony which was based on the analysis of the vaginal swab by a private laboratory, when no witness from the private laboratory testified at trial. By a five-to-four vote, the Supreme Court rejected Williams' claim, and held that his Sixth Amendment rights had not been violated. There was no majority opinion in *Williams*, however. A four-justice plurality concluded that "[o]ut-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which th[e expert's] opinion rests are not offered for the truth and thus fall outside the scope of the Confrontation Clause." *Id.* at 2228. Further, the plurality concluded that, even if the private laboratory's DNA analysis had been admitted for its truth, it did not violate the Confrontation Clause because the analysis was not "testimonial," because it had not been prepared "for the primary purpose of accusing a targeted individual" of a criminal offense. *Id.* at 2243.

In a concurring opinion, Justice Thomas agreed with the result reached by the plurality, but only because he concluded that the findings of the private laboratory "lacked the requisite 'formality and solemnity' to be considered 'testimonial' for the purposes of the Confrontation Clause." *Id.* at 2255 (Thomas, J., concurring). Besides advocating a different definition of

11

"testimonial" statements than the plurality, Justice Thomas also expressly disagreed with the plurality's conclusion that the results of the private laboratory's DNA analysis were not admitted for their truth. *Id.* at 2256 (Thomas, J. concurring).

Finally, four Justices dissented in *Williams*. The dissenters argued that the Confrontation Clause had been violated because the prosecution's testifying expert was little more than a "conduit" for admission of the DNA profile developed by the private laboratory; according to the dissent, the testifying witness could not serve as a "surrogate" for testimony of a knowledgeable technician from the laboratory which had developed the DNA profile in question. *Id.* at 2267 (Kagan, J., dissenting). Like Justice Thomas, the dissenters rejected the plurality's conclusion that the DNA profile developed from the vaginal swab was not admitted for its truth. *Id.* at 2268-72. The dissenters also rejected the plurality's conclusion that the private laboratory's analysis was not "testimonial"; in doing so, however, the dissenters rejected the definition of a "testimonial" statement advocated both by the plurality, and by Justice Thomas. *Id.* at 2272-77.

Given the fractured Court, *Williams* offers little guidance for future Confrontation Clause cases. As the Second Circuit observed, "*Williams* does not, as far as we can determine, . . . yield a single, useful holding relevant to the case before us. It is therefore for our purposes confined to the particular set of facts presented in that case." *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013); *see also Williams*, 132 S. Ct. at 2277 (Kagan, J., dissenting) ("What comes out of [*Williams*] . . . is – to be frank – who knows what."); *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013) ("As *Williams* does not yield a 'narrowest' holding that enjoys the support of five Justices, it does not provide a controlling rule useful to resolving this case."); *State v. Kennedy*, 735 S.E.2d 905, 920 (W. Va. 2012) ("it may be fairly said that the issue of whether *and to what extent* an expert may rely upon and/or then disclose (even with a limiting

instruction) as a predicate fact, testimonial hearsay, is unanswered by *Williams*"). Like *Bullcoming*, *Williams* does not justify departing from the holding of numerous prior Missouri decisions: a medical examiner may testify to his or her own opinions as to a victim's cause of death, and the nature and cause of particular injuries the victim suffered, even if the testifying examiner's opinions depend on, and disclose, factual observations made by an absent medical examiner who actually performed the victim's autopsy.

We note that the result required by *Fulton*, *Walkup*, and other Missouri cases is consistent with the results reached in numerous State and federal courts around the country, issued after the Supreme Court's decisions in *Bullcoming* and *Williams*. Thus, numerous federal Courts of Appeals continue to follow the Fourth Circuit's decision in *United States v. Johnson*, 587 F. 3d 625 (4th Cir. 2009), which holds that expert testimony does not violate the Confrontation Clause if the expert is testifying to his or her own independently developed opinions, and is not merely acting as a conduit for the admission of hearsay statements of other absent individuals. *Johnson* explained that

> *Crawford* forbids the introduction of testimonial hearsay as evidence in itself, but it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence.
>
> An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation. Allowing a witness simply to parrot out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion would provide an end run around *Crawford*. For this reason, an expert's use of testimonial hearsay is a matter of degree. The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem. The expert's opinion will be an original product that can be tested through cross-examination.

13

> This is as it should be because expert witnesses play a valuable role in our criminal justice system. . . . Some of the information experts typically consider surely qualifies as testimonial under *Crawford*. Were we to push *Crawford* as far as [the defendant] proposes, we would disqualify broad swaths of expert testimony, depriving juries of valuable assistance in a great many cases.

*Id.* at 635 (citations and internal quotation marks omitted). The post-*Bullcoming*, post-*Williams* cases which continue to follow *Johnson*'s approach include, *e.g.*, *United States v. Vera*, Nos. 12–50294 & 12–50366, 2014 WL 5352727, at *3-*5 (9th Cir. Oct. 22, 2014); *United States v. Kamahele*, 748 F.3d 984, 1000 (10th Cir. 2013); *United States v. Gomez*, 725 F.3d 1121, 1129-31 (9th Cir. 2013); and *United States v. Palacios*, 677 F.3d 234, 243-44 (4th Cir. 2012).

The Supreme Courts of at least three States have reached the same result:  the testimony of an expert witness does not violate the Confrontation Clause where the expert testifies to his or her own *bona fide*, independently developed opinions, even though the expert's opinions are based in part on observations made by others. *People v. Edwards*, 306 P.3d 1049, 1088 (Cal. 2013) ("Following *Williams v. Illinois*, we held that the confrontation clause was not violated when a testifying pathologist expressed forensic opinions on the basis of objective medical observations derived from a nontestifying pathologist's autopsy report and its accompanying photographs." (citing *People v. Dungo*, 286 P.3d 442, 450 (Cal. 2012)); *State v. Maxwell*, 9 N.E.3d 930, 949 (Ohio 2014) (following California Supreme Court's decision in *Dungo*); *State v. McLeod*, 66 A.3d 1221, 1226-33 (N.H. 2013) (following *United States v. Johnson* approach).[1]

---

[1]     Sauerbry cites to *State v. Navarette*, 294 P.3d 435 (N.M. 2013), to argue that Dr. Dudley's reliance on observations made by Dr. Gulino violated the Confrontation Clause. *Navarette* itself recognized, however, that "an expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause." *Id.* at 443 ¶ 22. The problem in *Navarette* was that the testifying medical examiner's testimony as to the presence of soot or stippling on a murder victim's body "merely repeat[ed] the subjective observations made by the non-testifying pathologist who performed the autopsy"; because of the nature of evidence of soot or stippling, "a subsequent pathologist could not arrive at his own, independent opinion about the presence of soot or stippling because there was no raw data to review." *State v. Garcia*, No. 33,756, 2014 WL 2933211, at *2 ¶ 11 (N.M. June 26, 2014) (citing *Navarette*, 294 P.3d at 43 ¶¶ 21-23). In this case, by contrast, Dr. Dudley testified to her own conclusions as to the nature and cause of Kellett's injuries, based on Dr.

14

In conclusion, consistent with this Court's prior decisions in *Fulton*, *Walkup*, and related cases, we hold that the trial court did not violate Sauerbry's rights under the Confrontation Clause when it permitted Dr. Dudley to testify to her opinions regarding Kellett's wounds and cause of death, despite the fact that Dr. Dudley's opinions were based on the observations made by Dr. Gulino. Dr. Dudley testified to her own opinions; she did not refer to any conclusions Dr. Gulino had drawn, and her testimony did not serve merely as a conduit for the transmission of Dr. Gulino's observations. Point I is denied.

## II.

Sauerbry's second Point argues that the trial court erred in prohibiting him from impeaching Huffman with respect to actions she took in connection with her son's trial for an unrelated murder: (1) allegedly giving false alibi testimony at her son's trial; and (2) expending a substantial amount of money to pay for attorneys to defend her son. Sauerbry theorized at trial that Huffman gave false testimony implicating him in Kellett's murder in an effort to reduce her son's murder sentence.

Huffman testified at Sauerbry's trial that Sauerbry had confessed to her in 1998 that he had killed Kellett, and described the murder to her. Huffman also testified that Sauerbry had expressed his intent to kill Kellett to her prior to Kellett's murder, and had also told her about throwing away his backpack at McDonald's. She admitted that she did not tell the police about Sauerbry's incriminating statements until 2009, claiming that her fear of Sauerbry dissuaded her from volunteering the information earlier.

---

Gulino's factual observations, and *Navarette* is therefore distinguishable. To the extent *Navarette* holds that a testifying pathologist may only rely on "raw data" which the testifying witness can directly observe (*e.g.*, information which is observable in autopsy photographs), we refuse to follow it.

Huffman testified that when she was contacted by police in 2009, she informed the detectives that her son was incarcerated and requested that Sauerbry not be incarcerated with him. She also stated that the police told her that her son would not receive any benefits from her testifying.

On cross-examination, Huffman admitted that she would like to see her son released from prison, that she had asked the detective whether her son's charges could be reduced when she approached police regarding Sauerbry's confession, and that she had hoped that revealing the information would make it possible for her son to be released from prison. She testified that the detective promised to talk with the prosecutors about her request, but told her that she would need to share her information first. On redirect examination, Huffman testified that her current understanding was that her son would not receive any benefit from her testimony, and that she was testifying solely because it was the right thing to do.

A detective testified that Huffman initially stated in 2009 that she would not share any information implicating Sauerbry until she had assurances that her cooperation would benefit her son.

## A.

We first address Sauerbry's claim that he was entitled to impeach Huffman with her allegedly false testimony at her son's murder trial. Because Sauerbry did not make an offer of proof with respect to this prior testimony, however, the issue is not preserved for appellate review. As such, we will only review the claim for plain error. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009). "Plain error relief will only be granted if manifest injustice or miscarriage of justice resulted from the error." *State v. Johnson*, 968 S.W.2d 123, 127 (Mo. banc 1998); Rule 30.20. Review for plain error is a two-step process. First, the Court must determine whether the claim of error "facially establishes substantial grounds for believing that manifest

16

injustice or miscarriage of justice has resulted." *State v. Martin*, 103 S.W.3d 255, 262 (Mo. App. W.D. 2003) (internal quotation marks omitted). Second, if the error is obvious, this Court may consider whether a miscarriage of justice will occur if the error is left uncorrected. *Id.*

A witness may be cross-examined about specific instances of his or her own conduct that speak to his or her character for truth and veracity, even if the issue is not material to the substantive issues in the case. *Mitchell v. Kardesch*, 313 S.W.3d 667, 677 (Mo. banc 2010). Such testimony may, however, be limited by the court if it is more prejudicial than probative. *Id.* at 679.

In this case, Sauerbry claims that Huffman gave false testimony in her son's murder trial. He made no offer of proof concerning this claim during trial, however. During proceedings on a pretrial motion *in limine*, Sauerbry's counsel provided the court with a copy of this Court's opinion in *State v. Holcomb*, 956 S.W.2d 286 (Mo. App. W.D. 1997), the direct appeal of Huffman's son's murder conviction. This was the sole support offered by Sauerbry for his claim that Huffman had previously given false testimony. In our opinion in *Holcomb*, we noted that Huffman's son was taped by an informant confessing to the murder, and telling the informant that "his mother was going to provide him with an alibi." *Id.* at 288. Our opinion also noted that, at trial, Holcomb's "mother and two other witnesses testified that he had come to his mother's house at about 2:30 a.m. on June 26, 1994 and stayed until 10:30 a.m. or 11:00 a.m. the following day." *Id.* at 289. It appears from the Court's opinion in *Holcomb* that the murder in that case had been completed by "[a]round 2:45 a.m." on the morning of June 26, 1994, when a witness testified to hearing the victim's car leaving the victim's home (where the murder occurred). *Id.* at 288. The opinion does not refer to the distance or driving time between the victim's apartment and Huffman's home.

17

Given the limited information provided to the trial court concerning Huffman's testimony in her son's murder trial, we cannot conclude that it plainly erred in refusing to permit Sauerbry to cross-examine Huffman concerning her earlier testimony. From all that appears, it may be perfectly consistent that Huffman's son committed a murder and left the murder scene "around 2:45 a.m.," and then arrived at Huffman's home "about 2:30 a.m." Because the trial court was not provided with Huffman's testimony from the earlier case, it is impossible to know how specifically, and with what degree of certainty, she described the fact of her son's arrival at her home, or the time of his arrival. Moreover, although Huffman's son may have believed that his mother's testimony would provide him with an alibi despite his guilt, there is no indication that Huffman's mother knowingly "conspired with" her son to provide false alibi testimony, as Sauerbry contends. In these circumstances, we cannot find that the trial court plainly erred in refusing to permit Sauerbry's cross-examination on this point.

**B.**

Unlike his claim concerning Huffman's allegedly false alibi testimony, Sauerbry made a specific offer of proof at trial concerning his desire to cross-examine Huffman about the money she had paid in her son's defense. The offer of proof indicated that Huffman had spent approximately $50,000 to hire counsel to represent her son at trial, on direct appeal, and in post-conviction and habeas corpus proceedings. Because Sauerbry made a detailed offer of proof on this issue, the claim is preserved for our review. *State v. Hefflinger*, 101 S.W.3d 296, 299 (Mo. App. E.D. 2003).

> Generally, a trial court's decision to exclude testimony is reviewed for an abuse of discretion, granting substantial deference to the trial court's decision. When reviewing allegations of improperly excluded testimony the focus is not on whether the evidence was admissible but on whether the trial court abused its discretion in excluding the evidence. This discretion is abused only when the ruling is clearly against the logic of the circumstances or when it is arbitrary and unreasonable. Even if the exclusion of testimony is erroneous, we will not

> reverse the judgment absent a finding that the error materially affected the merits of the action. A trial court's ruling on the admissibility of evidence will be upheld if it is sustainable under any theory.

*State v. Mort*, 321 S.W.3d 471, 483 (Mo. App. S.D. 2010) (citations and internal quotation marks omitted).

The trial court did not abuse its discretion. The fact that Huffman spent $50,000 to pay for her son's attorneys does not speak to her credibility as a witness in this case. While the considerable amounts Huffman spent show the extent to which she desired to assist her son, the jury had already heard testimony that Huffman had asked if her son's sentence could be reduced in exchange for her cooperation in connection with the Kellett murder, and had hoped that her cooperation would result in a benefit to her son. The amounts she had spent on her son's defense, which had no direct connection to her cooperation in Sauerbry's case, would have added nothing of consequence to the evidence which had already been developed.

Point II is denied.

### Conclusion

We affirm the circuit court's judgment.

_____
Alok Ahuja, Judge

All concur.

19