

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | WD78739 |
| Respondent, | ) | |
| v. | ) | OPINION FILED: |
| | ) | |
| BRYAN M. PIERCE, | ) | October 18, 2016 |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable Wesley Brent Powell, Judge**

**Before Division One:**
**Anthony Rex Gabbert, P.J., Thomas H. Newton, and Alok Ahuja, JJ.**

Mr. Bryan M. Pierce appeals his conviction following a bench trial for the class B felony of possession of child pornography, for which he was sentenced as a prior and persistent offender to fifteen years in the Department of Corrections. He claims that his due process rights were violated because the trial court misunderstood the range of punishment in imposing sentence and that the court erred in overruling his motion to suppress evidence because he was incapable of consenting to a search of his premises and no exception applied to allow a warrantless search. We affirm in part, reverse in part, and remand for resentencing.

Viewing the evidence in the light most favorable to the trial court's ruling on his motion to suppress,[1] Kansas City police officers were dispatched to Mr. Pierce's home in June 2013 to check on an emotionally disturbed person, following Mr. Pierce's call to a hotline about hearing voices, including his cat, telling him to stab himself. When the officers arrived, Mr. Pierce came out onto the front porch and repeated to Officers Robert Erpelding and Paul Russo that voices were telling him to stab himself in the heart and that his cat also wanted him to stab himself with a knife. Officer Erpelding offered to check the residence to make sure it was safe and confirmed with Mr. Pierce before officers entered that no one else lived in the home. He remained outside with Mr. Pierce, calling an ambulance, while Officer Russo and Sergeant Patrick Kelly, who had arrived at the home, went inside to "clear the residence" at Mr. Pierce's request. Mr. Pierce left in the ambulance, and Officer Erpelding was called inside to confirm whether still pictures, moving in a continuous "slide show" on the screen of a large computer monitor, depicted girls younger than age 17, some of whom were naked, posing in a sexually suggestive manner. The computer monitor was located in plain view in a first-floor room that also contained a mattress. Sergeant Kelly moved the computer mouse, and the images disappeared. Concerned whether the images were streaming from the Internet or were on the computer's hard drive, which could affect their preservation, Sergeant Kelly also opened a "My Pictures" computer-file folder and found similar images there. The officers removed the computer and its associated hardware for backing up and processing as evidence. A warrant was secured to search

_____

[1] *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007).

2

the computer, and Detective Kimberly Shirley-Williams took it to an FBI regional forensic computer lab for examination.

A July 2014 grand jury indictment charged Mr. Pierce with one count of the class B felony of possession of child pornography under section 573.037.[2] Mr. Pierce filed a motion to suppress in February 2015 arguing that the evidence was the fruit of a warrantless search and seizure in violation of his constitutional rights. The circuit court conducted a suppression hearing, and defense counsel argued that, as an emotionally disturbed person, Mr. Pierce was unable to consent to a search of his residence and if he had consented to anything it was to "clear the residence" which is not the same as a search, and that his rights were violated when the sergeant touched the computer mouse without a warrant and started to search the hard drive. The court *sua sponte* suggested that the issue was whether exigent circumstances might have justified the search, stating in this regard,

> My thought too on this was – that it's almost not even a consent issue. It's really almost an exigent exchange situation, that they've got someone who is emotionally disturbed who's claiming there's voices and they may have to clear or look through the residence to make sure there's not – you know, there's not a safety issue in the house.

Invited to address this issue, defense counsel contended that the officers had no need to "clear the residence," because Mr. Pierce had told the officers he lived alone and an ambulance had already been called for him. "So I don't know why they would need to, for any other individual safety or for Mr. Pierce's safety, need to clear the residence when clearly Mr. Pierce was already going to be going to the hospital, Your Honor," counsel stated.

---

[2] Statutory references are to RSMo 2000 and cumulative supplements, unless otherwise indicated.

In its order denying the motion to suppress, the circuit court agreed that Mr. Pierce, as an "emotionally disturbed party," could not voluntarily consent to a search of his residence. The court concluded that entry into the home was lawful, however, finding the officers "justified under this emergency situation [i.e., the defendant hearing voices telling him to harm himself,] to sweep or 'clear the residence' and determine if anyone was in the home." The court also ruled that the subsequent search and seizure of the computer was lawful "under the plain view and inevitable discovery doctrine."

The circuit court granted Mr. Pierce's motion to waive a jury trial. The bench trial began in April 2015 with the introduction of evidence that Mr. Pierce was a prior and persistent offender.[3] Mr. Pierce again objected to the introduction of the State's evidence seized from the computer, and the court again denied the motion. He was granted a continuing objection, but further asserted objections to the seized evidence during trial. Finding that more than twenty specific images taken from the computer depicted underage girls engaging in sexually explicit conduct, the court found Mr. Pierce guilty as charged.

During the sentencing hearing, the circuit court stated, "having proven the defendant up as a prior and persistent offender, it's my understanding that the defendant, his range of punishment was, pursuant to statute, extended to ten to 30 years, is that correct, Mr. Horsman?" The prosecutor responded by stating, "We had agreed

---

[3] The prior offenses included a guilty plea in Boone County to the class D felony of sexual abuse in the first degree, a guilty plea in Iowa to sexual abuse in the third degree arising from charges including indecent contact with a child and dissemination or exhibition of obscene materials to minors, a second guilty plea to lascivious acts with a child arising from similar charges in Iowa, and a guilty plea in Atchison County to the class C felony of domestic assault in the second degree.

4

to a lid of 20, Your Honor," and the court then asked, "A lid of 20 in exchange for the waiver of a jury trial, is that correct?" The prosecutor and defense counsel verified that this was the agreement. After taking evidence, exhaustively reviewing the factors it had considered in determining the sentence, and hearing Mr. Pierce's plea for clemency based on his efforts to overcome his addictions and professed innocence, as well as the arguments of counsel, the court imposed a fifteen-year sentence of incarceration. Mr. Pierce timely filed this appeal.

## Legal Analysis

### Sentencing Error

As to the first point, Mr. Pierce argues that, by stating that the enhanced range of punishment would be extended to ten to thirty years, the court had a "materially false understanding of the possible range of punishment" and, thus, violated his due process rights. Because no objection to the circuit court's statement about the range of punishment was made during the sentencing hearing, we must review the matter, if at all, for plain error. Rule 30.20.[4] Plain-error review is a two-step process. *State v. Sauerbry*, 447 S.W.3d 780, 790 (Mo. App. W.D. 2014). We first "determine whether the claim of error 'facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted.'" *Id.* (quoting *State v. Martin*, 103 S.W.3d 255, 262 (Mo. App. W.D. 2003)). And second, "if the error is obvious, this Court may consider whether a miscarriage of justice will occur if the error is left uncorrected." *Id.*

---

[4] Rule references are to the Missouri Supreme Court Rules of Criminal Procedure (2015), unless otherwise indicated.

5

Here, the circuit court erroneously stated that Mr. Pierce's enhanced range of punishment was ten to thirty years. Neither the prosecutor nor defense counsel corrected this erroneous statement, despite being asked if it was correct. Under section 558.011.1(2), the range of punishment for a class B felony is five to fifteen years. Although Mr. Pierce was convicted of a class B felony, because he was a prior and persistent offender, the total authorized *maximum* term of imprisonment was "any sentence authorized for a class A felony." § 558.016.7(2). The sentence authorized for a class A felony is ten to thirty years or life imprisonment. § 558.011.1(1). As this Court stated in *State v. Cowan*, 247 S.W.3d 617, 619 (Mo. App. W.D. 2008), the persistent-offender enhancement statute "only extends the maximum sentence but does not alter the minimum sentence." Because "[a] sentence passed on the basis of a materially false foundation lacks due process of law and entitles the defendant to a reconsideration of the question of punishment in the light of the true facts, regardless of the eventual outcome," we remanded in *Cowan* for resentencing. *Id.* (quoting *Wraggs v. State*, 549 S.W.2d 881, 884 (Mo. banc 1977)). As here, the circuit court in *Cowan* had recited the incorrect range of punishment—ten to thirty years, rather than five to thirty years. *Id.*

In *Cowan*, however, the appellant had properly preserved the error by raising it during the sentencing hearing. While the error here is obvious, because we are reviewing the matter for plain error, we must further determine whether a miscarriage of justice will occur if the error is not corrected. Mr. Pierce cites *State v. Olney*, 954 S.W.2d 698, 700-01 (Mo. App. W.D. 1997), and *State v. Taylor*, 67 S.W.3d 713, 716 (Mo. App. S.D. 2002), to support his argument that plain-error review and remand are

6

appropriate when a court has a mistaken understanding about the applicable punishment. In both cases, the circuit courts had imposed consecutive sentences, mistakenly believing that they lacked discretion to do otherwise under the armed criminal action statute. In *Olney*, this Court was reluctant to impinge on the trial court's sentencing authority, even though it acknowledged that the State had made a persuasive case that the trial court would not have viewed concurrent sentences as appropriate. *Olney,* 954 S.W.3d at 701. The court in *Taylor* essentially relied on *Olney* to find manifest injustice. *Taylor*, 67 S.W.3d at 716.

Mr. Pierce also cites *State v. Rowan*, 165 S.W.3d 552, 556 (Mo. App. E.D. 2005), where the court, applying plain-error review, found that the defendant had suffered prejudice due to the sentencing court's misunderstanding about parole eligibility, because that error "resulted in the imposition of the maximum sentence permissible under the statute," despite the court's expressed desire to grant the defendant leniency. The appeals court was also concerned that, while the error went to a collateral consequence of pleading guilty, it involved a sentencing court affirmatively misinforming the defendant. *Id.* at 555.

The State contends to the contrary that other authority supports upholding the sentence on the ground that where the trial court's comments demonstrate that it has decided to impose a sentence based on proper considerations, rather than on an erroneous interpretation of a statute, a defendant fails to meet his or her burden of demonstrating plain error in sentencing. *See, e.g., State v. Elam*, No. SD33905, 2016 WL 3555216, at *5 (Mo. App. S.D. June 28, 2016) (stating, "The record shows that the sentences were based on valid considerations; there is no indication that the trial court's

7

sentences were based on a misapprehension of the applicable law, or that the trial court relied on the prosecutor's misstatement of the law"); *see also State v. Scott*, 348 S.W.3d 788, 800) (Mo. App. S.D. 2011) (holding that trial court's comments and request that defense counsel respond to the State's position demonstrate that court "did not simply rely on prosecutor's incorrect interpretation of the statute but exercised independent discretion in imposing consecutive sentences), *abrogated on other grounds by State v. Sisco*, 458 S.W.3d 304 (Mo. banc 2015); *State v. Seaton*, 815 S.W.2d 90, 92 (Mo. App. E.D. 1991) (finding that trial court did not follow prosecutor's erroneous recommendation; court properly made sentences on sex crimes consecutive after expressing desire to impose the maximum sentence). Of note, is that, unlike here, each of these cases involved the prosecutor misstating the law.

The circuit court discussed the reasons underlying its impositon of a fifteen-year sentence at some length, primary among them that Mr. Pierce might re-offend and abuse other children. Because we have consistently remanded for resentencing on plain-error review, however, where the record shows that a sentencing court is under the mistaken impression that it lacks authority to impose a lesser sentence, we must vacate Mr. Pierce's sentence. *See, e.g., State v. Williams*, 465 S.W.3d 516, 519-20 (Mo. App. W.D. 2015) (stating that when "a court sentences a defendant based on a mistaken belief of the available range of punishment, it commits evident, obvious, and clear error, and such error results in a manifest injustice if left uncorrected"; also noting that the circuit court "still had before it the option of sentencing Williams to the minimum term available for the unenhanced felony"); and *State v. Summers*, 456 S.W.3d 441, 447 (Mo. App. W.D. 2014) (vacating sentence after finding trial court had mistakenly believed

8

that armed criminal action statute required consecutive sentences).  Here, the circuit court stated that the range of punishment was ten to thirty years, so we have no basis for concluding that it believed it had the discretion to sentence Mr. Pierce to anything less than ten years.  This point is granted.

**Motion to Suppress**

As to the second point, whether the computer images should have been suppressed because they were the fruit of an unlawful search and seizure, the circuit court determined that the search was justified by exigent circumstances. We cannot agree that the warrantless search of Mr. Pierce's home was justified by exigent circumstances.  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations and internal quotation marks omitted).  Despite this general principle, it is well established that law enforcement officers are not required to obtain a warrant before entering a home if exigent circumstances exist. *Kentucky v. King*, 563 U.S. 452, 460 (2011).  In particular, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City*, 547 U.S. at 403.  It bears emphasizing that "'[t]he exigent circumstances exception to the warrant requirement for police incursion into a home . . . is narrowly drawn," and only exists "'in cases of emergency.'" *State v. Hastings*, 450 S.W.3d 479, 485 (Mo. App. E.D. 2014) (quoting *State v. Rowland*, 73 S.W.3d 818, 822 (Mo. App. W.D. 2002)).

9

The evidence at the suppression hearing and at trial does not support invocation of the exigent circumstances doctrine in this case. This evidence makes clear that officers searched Mr. Pierce's home based on his consent, as an accommodation to try to calm him, *not* because they believed there was anything dangerous inside the residence. Officers spoke to Mr. Pierce on his front porch, outside his home. Officer Robert Erpelding, who primarily interacted with Mr. Pierce, testified at the suppression hearing that Mr. Pierce told him "that he was hearing voices and they were telling him to stab himself in the heart with a knife. He also informed me that his cat wanted him to stab him in the heart with a knife, as well." Officer Erpelding testified that he told Mr. Pierce that, "*if you'd like*, we can check out the residence for you, make sure it's safe." Before officers entered the home, Officer Erpelding verified with Mr. Pierce that no one was living with him, so that officers would not be surprised by encountering someone.

On cross-examination, Officer Erpelding repeated that the search of the residence was based on Mr. Pierce's consent:

> Q. And before he's taken to the hospital, you ask him if it's okay to check out the residence?
>
> A. What I did was I asked him if he would like if we checked out the residence, you know, for his safety, because there could be somebody in the house, you never know.

Officer Erpelding's testimony at trial is even clearer that the search was conducted at Mr. Pierce's request, to give him peace of mind, *not* because of any belief on the officers' part that an imminent risk of injury existed:

10

Q.    When you came into contact with him, what happened?

A.    I asked him what was going on tonight.  And he informed me that he was hearing voices, that he believed from the TV to tell himself to kill himself with a knife.  And he was also hearing voices about – from his cat to stab himself in the heart.

Q.    Okay. When he told you that, what did you do?

A.    Basically, I just tried to talk to him about small talk.  And I asked him, I said, well, sir, you know, if you'd like, we can go ahead and we can clear your residence, make sure there's nobody inside and – you know, if that works for you, that way give you a little peace of mind.

After engaging Mr. Pierce in "small talk," officers offered to search his home "if [he] would like" and "if that work[ed] for [him]," to "give [him] a little peace of mind."  Nothing in the record indicates that officers had any reasonable basis to believe that an emergency justified their warrantless entry into Mr. Pierce's home or that the home contained a person or object that presented an imminent risk of injury.  Mr. Pierce was outside the home, uninjured, and apparently cooperating with the officers.  He assured officers that they would not encounter anyone inside.  No exigency in this case justified the officers' disregard of the constitutional warrant requirement.

Still, we find that the circuit court properly denied Mr. Pierce's suppression motion.  "'[C]onsent searches are a valid exception to the warrant requirement of the Fourth and Fourteenth Amendments.'"  *State v. Patterson*, 489 S.W.3d 907, 911 (Mo. App. W.D. 2016) (citation omitted); *see also State v. Hyland*, 840 S.W.2d 219, 221 (Mo. banc 1992) (stating, "Where consent is lawfully obtained, law enforcement officers may conduct a search commensurate in scope with the permission given.  This is so even though the search was not otherwise supported by probable cause or reasonable suspicion of criminal activity").

11

> When the State relies on consent to justify a search, the State has the burden of proving the consent was freely and voluntarily given. The State does not satisfy this burden merely by showing a submission to a claim of lawful authority. Voluntariness of the consent is determined by looking at the totality of the circumstances. Consent is freely and voluntarily given if, considering the totality of the circumstances, the objective observer would conclude that the person giving consent made a free and unconstrained choice to do so. This determination involves a consideration of a number of factors, including, but not limited to, the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was already in custody, whether there was any fraud on the part of the officers, and the evidence of what was said and done by the person consenting.

*State v. Selvy*, 462 S.W.3d 756, 769 (Mo. App. E.D. 2015) (citations omitted); *accord State v. Cady*, 425 S.W.3d 234, 243 (Mo. App. S.D. 2014); *State v. Solis*, 409 S.W.3d 584, 591 (Mo. App. S.D. 2013). The subject's mental state, such as a state of intoxication, is also relevant to the voluntariness of consent to search. *State v. Dowdy*, 332 S.W.3d 868, 872 (Mo. App. S.D. 2011). "Consent is involuntary if the officer 'has reason to know that the consent was not knowingly granted.'" *Id.* (quoting *State v. Earl*, 140 S.W.3d 639, 641 (Mo. App. W.D. 2004)).

Here, the trial court found that Mr. Pierce had not validly consented to the search of his home. It explained:

> The officers were responding to a call from an "emotionally disturbed party." When they arrived, Defendant advised that he was hearing voices. Based on these circumstances, the State cannot establish[ ] that Defendant's consent to search his residence was the "product of a rational intellect and a free will," and therefore, voluntarily given.

(quoting *State v. Berry*, 526 S.W.2d 92, 100 (Mo. App. 1975)).

That Mr. Pierce was emotionally disturbed and had experienced auditory hallucinations, may not, by itself, be sufficient to render his consent to the search involuntary. *See* 4 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE

12

FOURTH AMENDMENT § 8.2(e) (5th ed. 2012, database updated 2015) ("It should not be assumed . . . that anyone suffering from some type of mental disease or defect is inevitably incapable of giving a voluntary consent to a search."); *see also,* Bryan S. Love, Comment, *Beyond Police Conduct:  Analyzing Voluntary Consent to Warrantless Searches by the Mentally Ill and Disabled,* 48 ST. LOUIS UNIV. L.J. 1469, 1470 (2004) (noting that such cases present "close, fact-sensitive questions").

Regardless whether the circuit court correctly found that Mr. Pierce lacked capacity to consent to a search, the circumstances here do not warrant application of the exclusionary rule.  "The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies"; instead, "exclusion has always been our last resort, not our first impulse."  *Herring v. United States,* 555 U.S. 135, 140 (2009) (citations omitted).  "[T]he exclusionary rule is triggered only when police practices are 'deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system.'" *State v. Johnson,* 354 S.W.3d 627, 633 (Mo. banc 2011) (quoting *Davis v. United States,* 564 U.S. 229, 240 (2011)); *see also State v. Carrawell,* 481 S.W.3d 833, 845–46 (Mo. banc 2016) (plurality opinion). "[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."  *Herring,* 555 U.S. at 143 (citations omitted).

Here, the officers were aware that Mr. Pierce had experienced auditory hallucinations, and he was agitated when they encountered him.  Mr. Pierce was, however, able to recognize that he needed assistance, call a suicide hotline to secure it,

13

explain to the officers why he was upset, express his desire that the officers clear his residence, and answer their questions as to whether they would encounter anyone inside. It appears that throughout the encounter Mr. Pierce was cooperative and lucid, and officers did not feel the need to physically restrain him. Nothing in the record indicates that Mr. Pierce's comments to officers were unintelligible or unrelated to the officers' queries. Further, there is no indication that the officers conducted the search with the intent of finding evidence of any crime or that their offer to "clear the residence" for Mr. Pierce was in bad faith or a subterfuge to conduct an illegal search.

In these circumstances, even though the court later determined that Mr. Pierce lacked capacity, it cannot fairly be said "that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Herring*, 555 U.S. at 143. Exclusion of the evidence developed as a result of the search would therefore not be warranted, even if that search was based on defective consent. *See Illinois v. Rodriguez*, 497 U.S. 177, 187 (1990) (finding no Fourth Amendment violation "when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises" with authority to consent to search); *United States v. Grap*, 403 F.3d 439, 445 (7th Cir. 2005) (where person consenting to search suffers from mental illness, "[t]he proper inquiry [as to application of exclusionary rule] focuses upon the objective facts, as presented to a reasonable inquirer, that would reasonably put him or her on notice that a voluntary consent could not be given."). This point is denied.

14

## Conclusion

The circuit court did not err in overruling Mr. Pierce's motion to suppress the evidence found by the officers during the warrantless search of his home, so we affirm the conviction. Because the circuit court misunderstood the range of punishment, however, we vacate the sentence and remand for resentencing only.

/s/ *Thomas H. Newton*
Thomas H. Newton, Judge

Gabbert, P.J., and Ahuja, J. concur.