**STATE of Missouri, Respondent,**

v.

**Prentiss R. FULTON, Jr., Appellant.**

**No. WD 71820.**

Missouri Court of Appeals,
Western District.

Dec. 6, 2011.

Susan L. Hogan, Appellate Defender, Kansas City, MO, for Appellant.

Chris Koster, Attorney General, Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division Three: KAREN KING MITCHELL, Presiding Judge, and JAMES M. SMART, JR., and GARY D. WITT, Judges.

KAREN KING MITCHELL, Presiding Judge.

Appellant, Prentiss R. Fulton, Jr. ("Fulton"), was found guilty by a jury of two counts of first-degree murder, section 565.020, two counts of first-degree assault, section 565.050, one count of first-degree robbery, section 569.020, and five counts of armed criminal action, section 571.015.[1] Fulton appeals his convictions. We affirm.

### Factual Background[2]

On December 17, 2006, James "Kelly" Yow, Lark Gardner, Dennis Jones, and Fulton were all driving in a blue Oldsmobile to Michael Bellinghausen's home in Clay County to acquire marijuana from Bellinghausen. The group initially intend-

---

1. All statutory citations are to RSMo 2000 unless otherwise indicated.

2. The evidence is viewed in the light most favorable to the trial court's ruling on the motion to suppress. *State v. Leavitt,* 993 S.W.2d 557, 560 (Mo.App. W.D.1999).

ed to purchase the marijuana, but as they were driving, someone mentioned simply taking the drugs from Bellinghausen instead. Yow had previously advised the group that Bellinghausen was known to keep a portable safe with him at all times that contained both money and drugs.

When the group arrived at Bellinghausen's residence, Fulton and Gardner entered the home. Inside, Bellinghausen and his girlfriend, Angela Windle, were asleep in the back bedroom, while Bellinghausen's roommate, Patrick Hooten, and his girlfriend, Christina Smith, were in the living room. Fulton, carrying a black, semi-automatic, nine-millimeter gun with a red laser on the front, shot Hooten in the head, killing him instantly. He also shot Smith in the head. Fulton and Gardner went to the back bedroom, where they kicked in the door, waking Bellinghausen and Windle. Fulton pointed the laser sight at Bellinghausen and told him to "get the safe, get the safe, get the money." Bellinghausen told them that the safe was right next to the bed, and they instructed him to bring it out of the bedroom. Bellinghausen complied.

After the safe was opened, Bellinghausen and Windle were ordered into the kitchen and onto their hands and knees. Fulton and Gardner began arguing that there was supposed to be more money, and one of them turned to Bellinghausen and demanded to know where the rest of the money was. Bellinghausen said that there was nothing else, but he told the men to take his laptop and whatever they wanted and just leave. Fulton then shot Bellinghausen in the face, causing him to immediately lose consciousness and fall to the ground. When Bellinghausen regained

consciousness, he saw Windle lying on the ground next to him, twitching and bloody.

Gardner left the house first, telling Yow and Jones that Fulton was "acting crazy," and he tried to get Yow and Jones to drive away. Yow heard two or three gunshots, and then Fulton came out of the house, carrying the semi-automatic gun in one hand and an eight-inch-long kitchen knife in the other. A white safe and a laptop computer were also brought into the car. Fulton pointed the gun at Yow and told him to drive. Yow complied.

While the group was driving away, Gardner kept telling Fulton, "you need to take your weight, you need to take your weight,"[3] and Fulton kept repeating, "no witnesses, no witnesses." Jones saw Fulton pointing the gun at Gardner's head and checking to see how many bullets he had left. Fulton directed Yow to take the first exit off of the highway, and as Yow did so, Jones jumped out of the moving vehicle, believing that Fulton intended to kill them all. Around the same time, Fulton shot Gardner in the head. Yow immediately slammed on the brakes and stopped the car. He then felt a sharp piercing pain in his back and realized that Fulton was stabbing him with the kitchen knife.

Yow got out of the car. He eventually flagged down a motorist who took him to a hospital. Jones also ran until he got ahold of his mother to pick him up. Gardner survived the gunshot wound, but it shattered his jaw; he had to have his jaw wired shut and an open tracheotomy in order to breathe.

Law enforcement eventually found the blue Oldsmobile abandoned by the side of the road. Inside, they found a laptop with

---

**3.** Yow took this to mean that Fulton needed to own up to the fact that he shot the victims. Jones testified that Gardner expressed concern that his fingerprints were "all over that house." Jones took Gardner's statements to imply that if they were caught, he would tell what Fulton had done.

Bellinghausen's login, a portable safe containing Bellinghausen's wallet, a large kitchen knife from Bellinghausen's home, a shell casing, and lots of blood. The investigation eventually led officers to Fulton, and when they sought him out for questioning, Fulton led police on a foot chase. At one point, he stopped and disappeared between two houses for about 30 seconds before reemerging and being apprehended. A few days later, the homeowner of one of the two residences contacted law enforcement because he had located a nine-millimeter semi-automatic handgun with a laser sight in his flower bed. The gun was tested, and it was determined that bullets and shells recovered at the scene and from the victims were fired from the gun.

After he was taken into custody and advised of his *Miranda*[4] warnings, Fulton agreed to make a statement. He admitted riding around in a blue Oldsmobile with some guys and smoking marijuana the evening of the murders. But he claimed he was dropped off at his home around 11:00 p.m., and he denied being involved in the murders and assaults at Bellinghausen's home.

Bellinghausen was in a medically induced coma for four or five days, lost several teeth, and had to have his jaw wired shut for two months as a result of his injuries. Smith was shot in the head and was in a coma for ten days. She suffered permanent brain damage. Hooten and Windle died from their injuries.

Before trial, Fulton filed a "Motion to Preclude Dr. Thomas Young, Dr. Mary Dudley or Dr. Laura Knight from Testifying in Place of Dr. Thomas Gill." The motion argued that Dr. Gill performed the autopsies on Hooten and Windle but had since resigned and moved to California. Fulton alleged that under the holdings in

*Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *State v. March*, 216 S.W.3d 663 (Mo. banc 2007); and *State v. Bell*, 274 S.W.3d 592 (Mo.App. W.D.2009), "[t]he admission of Dr. Gill's report, and the testimony of Dr. Young, Dr. Dudley or Dr. Knight regarding, or based on, the contents or conclusions of Dr. Gill's report would constitute inadmissible hearsay." The court denied Fulton's motion.

Dr. Young testified that, though he did not perform the autopsies of Hooten or Windle, he did review the autopsy reports, photographs, x-rays, and the medical examiner's investigative file to reach his own independent conclusions as to the cause and manner of death. Dr. Young testified that the materials on which he relied were of the type generally relied on by experts in his field. Dr. Young testified that Hooten was shot in the back of the head, and that, in his opinion, the single gunshot wound was Hooten's cause of death. Dr. Young also testified that Windle received three gunshot wounds—one to the head, one to the shoulder, and one to a finger. He testified that, in his opinion, the combination of the gunshot wounds to her head and shoulder caused her death.

Fulton's defense at trial was that the State could not satisfy its burden of proof and establish that he was the person that shot the victims. He did not contest that the victims died of gunshot wounds to the head.

The jury found Fulton guilty of all charges. The court sentenced Fulton to two terms of life imprisonment without parole for the first-degree murders, two terms of life imprisonment with parole for the corresponding armed criminal action counts, three terms of thirty years imprisonment for the first-degree robbery and

**4.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

first-degree assaults, and three terms of seventy-five years for the corresponding armed criminal action counts, with all sentences to run consecutively.

## Standard of Review

 "The standard of review for the admission of evidence is abuse of discretion." *State v. Reed*, 282 S.W.3d 835, 837 (Mo. banc 2009). The trial court's "exercise of this discretion will not be disturbed unless it is clearly against the logic of the circumstances." *Id.* (quoting *State v. Freeman*, 269 S.W.3d 422, 426–27 (Mo. banc 2008)). "For evidentiary error to cause reversal, prejudice must be demonstrated." *Id.* "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *State v. Forrest*, 183 S.W.3d 218, 224 (Mo. banc 2006).

██ While abuse of discretion is typically the standard employed for reviewing the admission of evidence, "whether a criminal defendant's rights were violated under the Confrontation Clause [5] by the admission of [that evidence] is a question of law that [an appellate court] reviews *de novo.*" *March*, 216 S.W.3d at 664–65.

## Analysis

██ In his sole point on appeal, Fulton claims that the trial court abused its discretion in allowing Dr. Young to testify about the autopsies performed on Hooten and Windle by Dr. Gill because doing so violated his rights to: (1) cross-examine and confront the witnesses against him; (2) a fair trial; and (3) due process of law insofar as Dr. Gill's report and opinions were testimonial hearsay, and Fulton had not had a *prior* opportunity to cross-examine Dr. Gill. Fulton further claims that he was prejudiced by the admission of Dr. Young's testimony because Fulton challenged the accuracy of Dr. Young's conclusions and testimony as part of his defense. The State counters that it offered no hearsay evidence because Dr. Young testified to his *own* opinions and conclusions, rather than those of Dr. Gill. The State further asserts that to the extent any evidence of Dr. Gill's opinions or conclusions was introduced at trial, it was done by Fulton and does not warrant relief. We agree with the State.

██ "On a number of occasions this Court has addressed whether, in the wake of *Crawford v. Washington* ... a medical examiner other than the one who performed an autopsy may testify to the results of the autopsy, or to opinions which rely on the results of the autopsy, and whether an autopsy report prepared by an absent medical examiner may itself be admitted into evidence." *State v. Dudley*, 303 S.W.3d 203, 208 (Mo.App. W.D.2010) (internal citations omitted) (collecting cases). The general conclusion reached in those cases is that the testifying examiner may properly testify to his or her *own* opinions and conclusions, even if relying upon the absent examiner's report, without violating the Confrontation Clause, so long as the testifying examiner does not discuss the absent examiner's opinions or conclusions, and the absent examiner's report is not admitted into evidence. *See State v. Tillman*, 289 S.W.3d 282, 289 (Mo.App. W.D.2009); *State v. Martin*, 291 S.W.3d 269, 284 n. 12 (Mo.App. S.D.2009); *State v. Walkup*, 290 S.W.3d 764, 767–68 (Mo.App. W.D.2009); *State v. Haslett*, 283 S.W.3d 769, 778 (Mo.App. S.D.2009); and *Bell*, 274 S.W.3d at 595. We also determined that where improper hearsay was presented by

**5.** This clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.

the testifying examiner, it was subject to harmless error analysis. *Dudley,* 303 S.W.3d at 208; *Martin,* 291 S.W.3d at 284; *Walkup,* 290 S.W.3d at 768; *Bell,* 274 S.W.3d at 595; and *State v. Davidson,* 242 S.W.3d 409, 417 (Mo.App. E.D.2007). And we found the admission of such hearsay to be harmless where the defendant makes no challenge to the medical examiner's opinion as to the cause of death. *Dudley,* 303 S.W.3d at 209; *Martin,* 291 S.W.3d at 287; *Bell,* 274 S.W.3d at 596; and *Davidson,* 242 S.W.3d at 418.

Since our decisions, the United States Supreme Court decided *Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). *Bullcoming* addresses the question of "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." *Id.* at 2710. Though not dealing specifically with autopsy reports, the rationale in *Bullcoming* supports our prior decisions.

In *Bullcoming,* the defendant was arrested for driving under the influence, and when he refused to take a breath test, a warrant was obtained for a blood sample to determine his blood alcohol content. *Id.* The defendant's blood sample was sent to the New Mexico Department of Health, Scientific Laboratory Division, for analysis. *Id.* At the defendant's subsequent trial, the forensic analyst who had determined the defendant's blood alcohol content to be 0.21 did not testify because he was, at the time, placed on unpaid leave for an unidentified reason. *Id.* at 2711–12. In his place, New Mexico presented evidence from a different scientist from the Scientific Laboratory Division, along with

the testing analyst's report. *Id.* at 2712. The Supreme Court reversed and remanded the case, holding that "[a]s a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." *Id.* at 2713. The Court determined that "the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Theresa.'" *Id.* at 2715 (quoting *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 2537 n. 6, 174 L.Ed.2d 314 (2009)). But in rejecting New Mexico's arguments, the Court noted that the State never asserted that the testifying analyst "had any 'independent opinion' concerning Bullcoming's BAC." *Id.* at 2716. The Court noted that "New Mexico could have avoided any Confrontation Clause problem by asking [the testifying analyst] to retest the sample, and then testify to the results of his retest rather than to the results of a test he did not conduct or observe." *Id.* at 2718.

In a concurring opinion, Justice Sotomayor clarified various factual scenarios *not* covered by the principal opinion. *Id.* at 2721–22 (Sotomayor, J., concurring). Among those scenarios identified was "a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id.* at 2722.

The scenario identified by Justice Sotomayor is the very scenario presented by the case before us (assuming Dr. Gill's report is itself "testimonial" within the meaning of the Confrontation Clause). Dr. Young generally testified about his *own* opinions and conclusions, and Dr.

Gill's reports were not offered or admitted into evidence. Dr. Young's conclusion that the gunshot wounds to the heads of the victims caused their deaths was based, in part, on photographs taken during the autopsies by Michelle Nordyke and a wound chart prepared by Detective Steinbach, both of whom testified at Fulton's trial. There was also evidence presented through many other witnesses indicating that the victims were shot in the head. Dr. Young's testimony regarding his own opinions and conclusions did not constitute hearsay, and thus, did not violate the Confrontation Clause. *Haslett*, 283 S.W.3d at 778; *see also Tillman*, 289 S.W.3d at 288 ("An expert witness is entitled to rely on hearsay evidence to support his opinion so long as that evidence is of the type reasonably relied upon by other experts in that field; such evidence need not be independently admissible.") (quoting *State v. Hendrix*, 883 S.W.2d 935, 940 (Mo.App. W.D. 1994)); and *State v. Owsley*, 959 S.W.2d 789, 795–96 (Mo. banc 1997) (finding no error in allowing a medical examiner to testify as an independently qualified expert who bases his or her opinion on the factual information in an autopsy report prepared by a different doctor because such testimony is not hearsay).[6]

■ Dr. Young did testify at one point to Dr. Gill's conclusion that "[t]here is absence of soot or stippling." Dr. Young also affirmed that his own finding of an absence of soot or stippling was the same as Dr. Gill's. This evidence, however, was elicited by Fulton during cross-examination, and, therefore, is not grounds for reversal. *See* § 545.030.1(16) (a judgment shall not be "in any manner affected ... [f]or any error committed at the instance or in favor of the defendant"); and *Has-*

*lett*, 283 S.W.3d at 778 n. 8 ("A defendant may not take advantage of self-invited error nor complain about matters he himself brings into the case.") (quoting *State v. Uka*, 25 S.W.3d 624, 626 (Mo.App. E.D. 2000)).

■ But even if this evidence had been introduced by the State, reversal would not be required because Fulton suffered no prejudice. Fulton's factual situation is very similar to the facts in *State v. Bell, supra.* In *Bell*, the testifying examiner indicated that her opinion comported with the absent examiner's opinion, and she then testified to the absent examiner's opinion regarding cause of death and the absence of soot or stippling on the victim. *Bell*, 274 S.W.3d at 594. Although we found this testimony to be admitted in error, we found no prejudice because the autopsy report was never offered or admitted into evidence, and because "[t]he *conclusion* reached in the autopsy report was not a contested issue" at the trial. *Id.* at 596.

Similarly, in this case, the State neither offered nor admitted Dr. Gill's autopsy report into evidence, and Fulton never contested that the victims' causes of death were the result of gunshot wounds. Though he challenged Dr. Young's determination that Windle's injury indicated that she was against a hard surface when shot, he never argued that her death was caused by something other than the gunshot wounds she received, regardless how she received them. Consequently, Fulton has failed to demonstrate prejudice from the admission of hearsay he elicited.

Point denied.

---

**6.** Fulton did not challenge that the materials on which Dr. Young relied were of the type generally relied on by experts in his field.

Therefore, Fulton does not challenge whether there was a sufficient basis for Dr. Young's testimony.

### Conclusion

Dr. Young's testimony as to his own opinions and conclusions did not constitute hearsay and cannot serve as the basis for a claimed Confrontation Clause violation. The limited testimony Dr. Young offered regarding Dr. Gill's opinions and conclusions was elicited by Fulton, thus precluding his current complaint. The trial court's ruling is affirmed.

JAMES M. SMART, JR., Judge, and GARY D. WITT, Judge, concur.