STATE of Missouri, Respondent,

v.

Michael IVY, Appellant.

No. ED 104698

Missouri Court of Appeals,
Eastern District,
DIVISION TWO.

Filed: October 24, 2017

FOR APPELLANT: Gwenda R. Robinson, Missouri Public Defender's Office, 1010 Market Street, Suite 1100, St. Louis, Missouri 63101.

FOR RESPONDENT: Karen L. Kramer, Assistant Attorney General, PO Box 899, Jefferson City, Missouri 65102.

Philip M. Hess, Judge

## Introduction

Michael Ivy was convicted by a City of St. Louis jury of two counts of first-degree robbery and two counts of armed criminal action arising out of two robberies of the same 7-Eleven convenience store at 5604 Gravois Avenue in the City of St. Louis. The first robbery occurred around 11:30 p.m. on July 5, 2015, and the second at approximately 4 a.m. on July 13, 2015. Ivy appeals, contending the trial court abused its discretion in making these rulings: (1) denying his objection to the State presenting rebuttal evidence in response to Ivy's girlfriend's testimony about she and Ivy going to Six Flags the afternoon of July 13th; (2) denying his motion for a mistrial and motion for a new trial because the State failed to disclose the 7-Eleven had been robbed approximately two hours before the 4 a.m. robbery on July 13th; (3) overruling his objection to expert testimony matching Ivy's palm print to the print taken from 7-Eleven on July 5th because the expert testimony was based, at least in part, on another examiner's opinion who first analyzed the prints; and (4) overruling Ivy's objection to the expert testimony matching Ivy's palm print to the print lifted because a proper foundation had not been laid for the use of Ivy's prints the police had on file. We affirm.

## Factual and Procedural Background

On July 5, 2015, at approximately 11:30 p.m., a man wearing a hood and sunglasses and carrying a gun robbed the 7-Eleven at 5604 Gravois Avenue. The robbery was caught on video surveillance inside the store and the police obtained a print of the robber's left palm placed on the counter that had just been wiped down prior to the robbery.

About a week later, on July 13, 2015, at about 4 a.m., a man wearing a hood and sunglasses and carrying a gun robbed the same 7-Eleven. This robbery was also caught on video surveillance inside the store.

At approximately 3:30 p.m. that same day, Ivy was pulled over by police for a traffic violation. Ivy had outstanding warrants and was arrested. The police searched his vehicle and found a revolver under his car seat.

The cashier from the July 5th robbery identified the revolver found with Ivy as the gun used during the robbery. The police also matched the palm print lifted from the counter on July 5th to Ivy's

prints on file. The cashier from the July 13th robbery identified Ivy as the robber from a photographic lineup.

Ivy was charged with two counts of first-degree robbery and two counts of armed criminal action. Ivy filed a request for discovery with the State, requesting, among other things, the names of all witnesses the State intended to call at trial and any material or information, within the possession or control of the State, which tended to negate his guilt. Ivy also filed a notice of alibi with the State, disclosing that his girlfriend would testify at trial that she was with him at her home from around 12 a.m. to 12 p.m. on July 13th.

Ivy was tried by a jury. Videos of both robberies were played. The cashier from the July 5th robbery testified and identified the gun found with Ivy when he was arrested on July 13th as the gun used during the July 5th robbery.

An officer with the evidence technician unit testified that he processed the crime scene at the 7-Eleven on July 5th and obtained a palm print from the counter he lifted onto a latent print card he sent to the latent print unit to be examined as possible evidence.

The State called an expert print examiner to testify about the results of the palm print lifted from the counter following the July 5th robbery. The defense objected, arguing the witness did not perform the analysis. The State argued that the witness performed her own analysis. The court allowed the witness to testify and indicated it would rule on Ivy's objection after it heard whether the witness performed her own analysis.

The witness explained that while another examiner who had since left the St. Louis police department analyzed the print before she did, she performed her own analysis and came up with the same con-

clusion as the first examiner. She explained that she conducted her own examination and verified what the first examiner had found. The State then asked her what conclusion she reached regarding the prints and the witness started to explain what the first examiner had done. At this point, the defense objected to any testimony about what the first examiner did pursuant to the Confrontation Clause. The State withdrew its question.

The State then asked if she examined known fingerprints of Ivy. The witness responded affirmatively and explained the process she performed to compare Ivy's known fingerprints to the fingerprint lifted from the 7-Eleven. When the witness was asked about her conclusion on whose prints were lifted from the 7-Eleven, the defense objected, contending that a sufficient foundation had not been laid for Ivy's prints the police had on file. The court overruled Ivy's objection, and the witness testified the palm print lifted was the left palm print of Ivy.

On cross-examination, the defense established that the witness had not taken Ivy's standard prints and that the prints came from a database of prints. On re-direct, the State established that the known prints of Ivy were kept in the ordinary course of business with the St. Louis police department.

The cashier from the July 13th robbery also testified and affirmatively identified Ivy as the robber and the gun found as the one used during the robbery. He also testified that he was robbed twice that day.

Another cashier working July 13th also testified. He testified that they were robbed twice that night, and that he was outside on a break when they were robbed at 4 a.m.

Following this testimony and outside the presence of the jury, the defense informed

the court it had never been informed there was an earlier robbery on July 13th and requested a copy of the police report from that incident. The State claimed it was unaware there were two robberies. The court instructed the State to locate the police report and give it to the defense. A brief recess was taken and the State located the police report and turned it over to the defense. That report revealed that the 7-Eleven had been robbed approximately two hours before the 4 a.m. robbery and that a witness had identified the robber as someone she knew as "Brian" and the getaway driver as a former neighbor she knew. Ivy moved for a mistrial, arguing that an investigation might produce exculpatory evidence he may present. The court denied the motion but indicated it may reconsider its ruling in light of further evidence.

The officer who arrested Ivy testified that he arrested Ivy around 3:30 p.m. on July 13th and found a gun underneath the seat in the vehicle Ivy was driving. A detective testified that Ivy told him he had not been to the 7-Eleven at issue in the last eight months. The State rested.

Ivy's sole witness was his girlfriend. She testified about text messages on her phone around 2:30 a.m. on July 13th. She explained that she and Ivy were at her home in south St. Louis but were in different parts of the house and were texting each other. She testified that she and Ivy had sex, then they fell asleep around 3:00 a.m., and did not wake until 2 p.m. on July 13th.

On cross-examination, she testified that after she and Ivy got up they went to Six Flags. The State asked if she used her season pass to get in and she confirmed that she did. The defense rested and the State indicated that it had rebuttal evidence that would not be available until the next day. The court asked the State what evidence it intended to present and the

State asked to tell the court in camera so it did not have to reveal its "tactic" to the defense.

The next day the State called a representative from Six Flags. The defense objected to the witness testifying because the State did not disclose the witness in response to its discovery request or notice of alibi. The State argued that disclosure was not required because the evidence was used for impeachment. The court overruled the objection and the Six Flags representative testified that Ivy's girlfriend's Six Flags season pass was used on July 11th, not July 13th.

Ivy was found guilty of all four charges. Ivy filed a motion for a new trial and the court held an evidentiary hearing on the motion. At the hearing the police report and the surveillance video from the earlier 2 a.m. robbery on July 13th were admitted into evidence. The police report noted that a named witness told the police that she was 100% certain that she knew the robber and the getaway driver. Defense counsel testified that she tried to locate the witness but her current whereabouts were unknown. She testified that if Ivy was given a new trial they would attempt to subpoena her as a witness.

The detective testified that he was the main investigating officer for the two robberies Ivy was charged with and that he wrote supplemental police reports for both robberies. He testified that he was unaware of the 2 a.m. robbery on July 13th when he wrote his report, that different officers responded to the 2 a.m. and 4 a.m. robberies, and that the first time he learned about the 2 a.m. robbery was during Ivy's trial. He testified that he interviewed the cashier who identified Ivy as the robber at trial multiple times and administered the lineup to him but the cashier never mentioned the 2 a.m. robbery until trial.

The cashier from the July 13th robbery who identified Ivy as the robber at trial testified that the 2 a.m. robber and the 4 a.m. robber were different people and that Ivy was the 4 a.m. robber. He testified that the first robber was wearing a baseball cap and that the difference between the 4 a.m. and 2 a.m. robbers was that one wore a mask. He testified that after the robbery a witness came in and told him the name of the getaway driver and where she lived. The parties stipulated to the court that no one had been arrested or charged for the 2 a.m. robbery.

The court denied the motion for a new trial, finding that the robber in the 2 a.m. video did not look like Ivy, that the information regarding the 2 a.m. robbery did not tend to negate Ivy's guilt, and that the evidence presented at the hearing did not support a finding of a discovery violation by the State. Ivy was sentenced to concurrent terms of seventeen years' imprisonment on all counts. This appeal follows.

## Standard of Review

On direct appeal, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998). We review the facts in the light most favorable to the verdict. *Id.*

## I. Failure to Disclose the State's Rebuttal Witness

In point I, Ivy contends the trial court abused its discretion by denying his objection to the State presenting rebuttal evidence from the Six Flags representative that contradicted his girlfriend's testimony about being at Six Flags the afternoon of July 13th. Ivy argues that the evidence

directly refuted his alibi defense and that it should have been excluded because it was not disclosed to him before trial despite Ivy's discovery request and notice of alibi. The State counters it did not have to disclose the rebuttal witness because it did not rebut Ivy's alibi since the robbery was committed at 4 a.m. and the testimony concerned the afternoon of July 13th. The State avers that the rebuttal witness merely impeached Ivy's girlfriend's testimony and was therefore not required to be disclosed. Finding no abuse of discretion by the trial court, point I is denied.

The trial court has broad discretion to determine the admissibility and scope of rebuttal testimony which we review for an abuse of discretion. *State v. Campbell*, 356 S.W.3d 774, 778 (Mo. App. E.D. 2011). Rule 25.03(A)(1)[1] provides that the State shall, upon written request by defendant's counsel, disclose to the defense the names and last known addresses of persons whom the State intends to call as witnesses at any hearing or at the trial, with their written or recorded statements, and existing memoranda, reporting or summarizing part or all of their oral statements. Rule 25.03 gives the defendant the opportunity to prepare his case before trial and avoid surprise. *State v. Smith*, 491 S.W.3d 286, 297 (Mo. App. E.D. 2016).

While the State must disclose the witnesses it intends to call, there is no obligation to disclose rebuttal witnesses, unless they are called to rebut a defense of alibi or mental disease or defect. *Campbell*, 356 S.W.3d at 779. In *State v. Curtis*, 544 S.W.2d 580 (Mo. banc 1976), the Missouri Supreme Court recognized that under the law announced by the United States Supreme Court in *Wardius v. Oregon*, 412

---

1. All references to rules are to the Missouri Supreme Court Rules (2016) unless otherwise indicated.

U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), "due process requires that State rebuttal witnesses not be permitted to testify in situations where a defendant· has disclosed he intends to rely on the defense of alibi· (and disclosed his witnesses) and the State has failed to disclose the names of the persons to be called to rebut the defense of alibi." ·

■ The rule set out in *Curtis* is based on the proposition it is fundamentally unfair to require a defendant to disclose the details of his alibi and be exposed to potential surprise from state witnesses refuting the matters disclosed. *State v. Clark*, 756 S.W.2d 565, 573 (Mo. App. W.D. 1988). *Curtis* does not apply, however, when the evidence is not directed at disproving the alibi but is directed at the credibility of a witness. *Id.*; see also *State v. Evans*, 896 S.W.2d 56, 60 (Mo. App. W.D. 1995) ("These cases have made.it clear that they do *not* interpret *Wardius* to constitutionally · require exclusion of witnesses who merely impeach an alibi witness' credibility, but. do not actually impeach the defendant's alibi itself.").

Here, the Six Flags representative testified that Ivy's girlfriend's Six Flags season pass was used on July 11th, not July 13th. This testimony merely impeached the credibility of Ivy's girlfriend who testified that she had used it July 13th and therefore it did not have to be disclosed. See *State v. Lutjen*, 661 S.W.2d 845, 849 (Mo. App. W.D. 1983) (finding it within the discretion of the trial court to allow undisclosed rebuttal testimony that did not rebut defendant's alibi but bore on the witness's credibility). Moreover, Ivy's girlfriend's testimony that she and Ivy went to Six Flags sometime after 2 p.m. until dark on July 13th was further rebutted by the evidence that Ivy was arrested that day at 3:30 p.m. Thus, the Six Flag's representative's testimony was merely cumu-

lative evidence about Ivy and his girlfriend's whereabouts on the afternoon of July 13th. See *State v. Miner*, 639 S.W.2d 569, 572 (Mo. 1982). ·

■ While Ivy may· have intended for his girlfriend to provide him an alibi, i.e., that he was at her home during the crime, ·her testimony did not provide him one. That a witness is listed as an alibi witness does· not make the witness a true alibi witness; the witness has to provide an alibi for the crime. *Evans*, 896 S.W.2d at 62 n.7. Alibi means that a defendant claims he was at another and different place than that at which the alleged crime was committed. *Miner*, 639 S.W.2d at 571. The theory of. alibi is that the fact of defendant's presence elsewhere essentially contradicts his presence where the offense was committed;. therefore, he could not have participated. *Id.* at 571-72.

Here, Ivy's girlfriend testified that she was with Ivy the ·morning of July ·13th until they fell asleep around 3 a.m. and woke up around 2 p.m. She testified that after they woke up they went to Six Flags until after dark. But the robbery happened at 4 a.m. when she was asleep so she could not ·place Ivy at her home during the crime. Thus, Ivy's girlfriend was not a true alibi witness. See *Evans*, 896 S.W.2d at 62 ("Numerous Missouri cases hold that if a witness simply provides testimony as to what the defendant was doing or where he was at a time prior to the crime, the witness should not considered a true alibi witness at all because, even if believed, the witness' testimony does not show that the defendant was not present at the scene of the crime."). Ivy still could have robbed the 7-Eleven that was only a few miles from his girlfriend's home at 4 a.m. even if her testimony was true. We find that the trial court did not abuse its discretion in allowing the rebuttal testimony.

Further, Ivy's notice of alibi indicated his girlfriend would testify she was with him at her home from 12 a.m. to 12 p.m. on July 13th, but the testimony that was refuted is not related to that time period and did not refute the matters disclosed. The defense had the opportunity to discuss with Ivy's girlfriend what her testimony would be and the Six Flag's representative's testimony was merely cumulative evidence that Ivy was not at Six Flags the afternoon of July 13th as he was arrested that day at 3:30 p.m. Under these circumstances we find no fundamental unfairness. See *Miner*, 639 S.W.2d at 572. Point I is denied.

## II. Failure to Disclose that the 7-Eleven was Robbed Twice the Same Night

■ In point II, Ivy contends the trial court abused its discretion in denying his motion for a mistrial and motion for a new trial because the State failed to disclose that the 7-Eleven had been robbed just two hours before the 4 a.m. robbery Ivy was convicted of committing on July 13th. Ivy asserts this violated Rule 25.03 and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the undisclosed evidence was relevant to the cashier's ability to accurately and reliably identify Ivy as the robber and to show that someone else may have committed the 4 a.m. robbery. The State contends that it did not have to disclose the earlier robbery because it was not favorable to Ivy. For the reasons that follow, we find that the trial court did not abuse its discretion in denying Ivy's motions.

■ A mistrial is a drastic remedy and should only be used when prejudice to the defendant can be removed in no other way. *State v. Scott*, 943 S.W.2d 730, 736 (Mo. App. W.D. 1997). We review the trial court's decision on a motion for a mistrial for an abuse of discretion. *Id.* A mistrial is

not required just because a Rule 25.03 violation by the State has occurred. *Id.* The trial court's denial of a motion for a new trial is also reviewed under an abuse of discretion standard. *State v. Moore*, 411 S.W.3d 848, 852 (Mo. App. E.D. 2013).

■ The State's discovery obligations under Rule 25.03 and its constitutional obligations under *Brady* are separate and distinct. *Id.* Rule 25.03 requires the State, upon written request of defendant's counsel, to disclose "[a]ny material or information, within the possession or control of the [S]tate, which tends to negate the guilt of the defendant as to the offense charged, mitigate the degree of the offense charged, or reduce the punishment." If the defense request designates material or information "in the possession or control of other governmental personnel, the [S]tate shall use diligence and make good faith efforts to cause such materials to be made available to the defense counsel...." Rule 25.03 "imposes an affirmative requirement of diligence and good faith on the [S]tate to locate records not only in its own possession or control but also in the control of other governmental personnel." *Merriweather v. State*, 294 S.W.3d 52, 56 (Mo. banc 2009). Rule 25's purpose is to permit a party to prepare for trial, eliminate surprise, and afford the accused information with which to formulate a defense and meet opposing evidence. *State v. Goodwin*, 43 S.W.3d 805, 813 (Mo. banc 2001).

The burden is on the State to show that its search was diligent. *Id.* at 57. "Inadvertence and good faith do not excuse a failure to comply with Rule 25.03." *Id.* at 56. The importance of the evidence relates to prejudice and it may also provide context in assessing what constitutes "diligence" under Rule 25.03. *Id.* at 57.

■ When reviewing alleged discovery violations, the first question we must ask is

did the State's failure to disclose violate Rule 25.03. *State v. Clark*, 486 S.W.3d 479, 484 (Mo. App. E.D. 2016). Determining whether the State violated a rule of discovery is within the sound discretion of the trial court. *State v. Johnson*, 513 S.W.3d 360, 364 (Mo. banc 2016). If there has been a violation, the next question becomes what sanction the trial court should have imposed. *Clark*, 486 S.W.3d at 484.

Whether to impose sanctions for the violation lies within the sound discretion of the trial court which we review for an abuse of discretion. *State v. Thompson*, 985 S.W.2d 779, 785 (Mo. banc 1999). Failing to impose sanctions for a discovery violation will be an abuse of discretion if the violation resulted in fundamental unfairness or if it substantively altered the outcome of the case. *Id.* Fundamental unfairness occurs when the State's failure to disclose results in defendant's "genuine surprise" and the surprise prevents meaningful efforts to consider and prepare a strategy for addressing the evidence. *Id.* Whether fundamental unfairness resulted turns on whether there was a reasonable likelihood that timely disclosure of untimely-disclosed evidence would have affected the result of the trial. *Johnson*, 513 S.W.3d at 365. Bare assertions of prejudice are not sufficient to establish fundamental unfairness nor do they demonstrate how the outcome of the case was substantively altered. *Thompson*, 985 S.W.2d at 785.

Rule 25.18 governs sanctions and provides that if the court finds a discovery violation it "may order such party to make disclosure of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances."

"*Brady* holds that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Merriweather*, 294 S.W.3d at 54 (quoting *Brady*, 373 U.S. at 87, 83 S.Ct. 1194). The State has a duty to learn of any favorable evidence known to others acting on its behalf, including the police. *Merriweather*, 294 S.W.3d at 54-55 (citing *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense, the result would have been different. *Goodwin*, 43 S.W.3d at 812. This issue is whether the defendant received a fair trial in absence of the disputed evidence. *Id.* There are three components to a *Brady* violation: (1) the evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) the evidence must have been willfully or inadvertently suppressed by the State; and (3) prejudice must have ensued. *Merriweather*, 294 S.W.3d at 54 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). There can be no *Brady* violation where the defendant knew or should have known of the material or where the information was available to the defendant from another source. *Moore*, 411 S.W.3d at 855.

Here, we find that the trial court did not abuse its discretion in finding no Rule 25.03 or *Brady* violation. As to Rule 25.03, on the issue of whether the State violated Rule 25.03 by failing to disclose the 2 a.m. robbery to Ivy, the trial court held an evidentiary hearing and concluded that the State did not violate Rule 25.03. Given the broad discretion afforded to the trial court in determining whether the State violated a rule of discovery, we cannot conclude that the trial court abused its discretion in making this determination. *Johnson*, 513 S.W.3d at 364. Specifically, the trial court's

findings that the robber in the video of the 2 a.m. robbery did not look like Ivy and that the evidence from that robbery did not negate Ivy's guilt support that decision. See *Merriweather*, 294 S.W.3d at 57 ("While the importance of the evidence is relevant to the issue of prejudice, it also may be considered as context in assessing what constitutes 'diligence' under Rule 25.03.").

Even if we found that the State did violate Rule 25.03 by failing to disclose evidence of the 2 a.m. robbery prior to trial, however, we find that the trial court did not abuse its discretion in denying Ivy's motion for a mistrial and motion for a new trial because Ivy cannot show he was prejudiced. First, regarding Ivy's motion for a mistrial, Ivy's only requested sanction—a mistrial—is a drastic remedy and should only be used when prejudice to the defendant can be removed in no other way. *Scott*, 943 S.W.2d at 736. To determine what prejudice, if any, Ivy sustained because of this previously undisclosed robbery, the trial court ordered the State to obtain a copy of the police report and to produce it to the defense. This revealed that the 7-Eleven had been robbed approximately two hours earlier at 2 a.m. and that a witness identified the robber as a man she knew as "Brian" and the getaway driver as a former neighbor of hers. There was no evidence that the 2 a.m. and 4 a.m. robberies were related and the trial court denied the motion for a mistrial. This was not an abuse of discretion.

Further, Ivy claims he was prejudiced because he did not have an opportunity to impeach the cashier's identification of him with evidence that the cashier may have been confused by the other robbery. But Ivy did not ask the trial court for a continuance so he could question the cashiers about the 2 a.m. robbery and learn of any potential relevant evidence or the opportu-nity to re-call the cashiers as witnesses so he could explore the impact the 2 a.m. robbery had on the cashier's prior testimony. Had Ivy requested one or both these remedies and the court granted Ivy's request, Ivy could have potentially removed the prejudice he claims occurred. This further supports that the trial court did not abuse its discretion in denying Ivy's motion for a mistrial. See *State v. Bynum*, 299 S.W.3d 52, 62 (Mo. App. E.D. 2009) (noting that a defendant's failure to ask for a continuance can be considered by the appellate court in determining whether trial court abused its discretion).

The evidence produced at Ivy's hearing on the motion for a new trial shows that Ivy suffered no fundamental unfairness by not learning of the 2 a.m. robbery until trial. The cashier from the July 13th robbery who identified Ivy as the robber at trial testified that the 2 a.m. robber and the 4 a.m. robber were different people and that Ivy was the 4 a.m. robber. There is no reasonable likelihood that had evidence of the 2 a.m. robbery been disclosed to Ivy before trial, it would have affected the result of the trial. See *State v. Clark*, 486 S.W.3d 479, 486-87 (Mo. App. W.D. 2016) (finding that the defendant failed to establish fundamental unfairness despite the State's concession it violated Rule 25.03 by failing to turn over in-car police video and officer pocket recordings of shooting where the videos were produced during the trial). This is especially true given that the evidence against Ivy came from multiple sources, including witness identification of Ivy as the robber, witness identification of the gun found with Ivy as the gun used in the robbery, video surveillance of the robbery, and the impeachment of Ivy's girlfriend about his whereabouts on July 13th by police testimony of his arrest and the Six Flags representative's testimony about the date the season pass was used. See *State v. Kilgore*, 505 S.W.3d

362, 368 (Mo. App. E.D. 2016) (finding that while the State failed to make a diligent effort to conduct a background check of character witness that revealed felony background information which constituted impeachment evidence that would been useful to the defense, the defendant was not prejudiced because such evidence would not have within a reasonable probability made a difference given that the evidence against defendant did not come from a single source but also came from the victim and an eyewitness). The same analysis defeats Ivy's *Brady* claim because he cannot show he was prejudiced. Point II is denied.

### III. Admission of the Latent Print Examiner's Testimony

■ In point III, Ivy asserts that the trial court abused its discretion in overruling his objection to the latent print examiner's testimony matching Ivy's palm print to the lift of the palm print taken from the 7-Eleven counter after the July 5th robbery because her testimony was based, at least in part, on the opinion of another examiner who did not testify at trial in violation of the Confrontation Clause. The State contends that the examiner's testimony did not violate the Confrontation Clause because she testified based on her own analysis and independent findings. Finding no trial court error, point III is denied.

■ We typically review the trial court's evidentiary rulings for an abuse of discretion, but alleged Confrontation Clause violations are reviewed de novo. *State v. March*, 216 S.W.3d 663, 664-65 (Mo. banc 2007). The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "In *Crawford v. Washington*, the United States Supreme Court held that the Con-

frontation Clause demands that all testimonial evidence be excluded unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination." *March*, 216 S.W.3d at 665 (citing *Crawford*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). Confrontation Clause violations are subject to the harmless error test which requires that the error be harmless beyond a reasonable doubt, meaning there is no reasonable doubt that the error's admission failed to contribute to the jury's verdict. *March*, 216 S.W.3d at 667 (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

Our courts have considered several Confrontation Clause challenges in the wake of *Crawford* about autopsy reports. See, e.g., *State v. Sauerbry*, 447 S.W.3d 780, 784 (Mo. App. W.D. 2014). Those cases have held that the Confrontation Clause prohibits the introduction into evidence of an autopsy report prepared by an absent medical examiner, and testimony about the opinions and conclusions reached by the absent medical examiner. *Id.* "[T]he testifying examiner may properly testify to his or her *own* opinions and conclusions, even if relying upon the absent examiner's report, without violating the Confrontation Clause, so long as the testifying examiner does not discuss the absent examiner's opinions or conclusions, and the absent examiner's report is not admitted into evidence." *State v. Fulton*, 353 S.W.3d 451, 455 (Mo. App. W.D. 2011).

Outside the context of autopsy reports, this Court has also considered a claim that defense counsel was constitutionally ineffective at trial for failing to object to expert witness DNA testimony on the ground it violated the defendant's rights under the Confrontation Clause. See *Littleton v. State*, 372 S.W.3d 926 (Mo. App. E.D. 2012). In *Littleton*, the defendant was

charged with committing eleven separate robberies. At trial, the State intended to present evidence that defendant's DNA was discovered on cigarette butts recovered from one vehicle that was stolen, but prior to trial the State's technician who performed the DNA testing suffered a medical emergency and could not testify.

In the technician's place, the State offered the testimony of the technician's supervisor. The defense challenged the supervisor's testimony as improper hearsay in a motion in limine but not on Confrontation Clause grounds. The court held a hearing on the motion in limine and the supervisor testified that she had reviewed the methods and conclusions of the technician and confirmed that they were correct. The supervisor testified that her conclusion that the DNA evidence recovered from the car belonged to the defendant was independent of the technician's finding. The supervisor testified that, although she did not perform the actual DNA testing, the only difference between what she did and what the technician did was that the technician added the chemical to break open the cells.

The trial court denied the motion in limine, finding the supervisor's knowledge of the DNA testing and analysis was sufficiently independent of the unavailable technician who drafted the report. During the supervisor's testimony at trial the defendant renewed his objection on hearsay grounds. The trial court overruled the objection and the supervisor testified that the DNA recovered in the stolen car belonged to the defendant. The State did not admit into evidence the actual laboratory report containing the DNA testing findings, nor the technician's analysis.

On appeal, this Court found the defendant's rights under the Confrontation Clause were not violated. *Id.* at 931. Relying on the Missouri Supreme Court's *March* decision the Court concluded that "it is a violation of an accused's rights under the Confrontation Clause for a trial court to admit a police laboratory report prepared for the sole purpose of prosecution unless either the author of the document is subject to cross-examination at trial, or the author is unavailable and the accused had a prior opportunity to cross-examine the preparer of the document." *Id.* (citing *March*, 216 S.W.3d at 667). Distinguishing *March*, the Court noted that the laboratory report prepared by the absent technician was not admitted into evidence, but instead the State offered the supervisor's testimony as to the supervisor's own findings. *Littleton*, 372 S.W.3d at 931. The Court found this was noteworthy because the defendant could cross-examine the supervisor during the hearing on the motion in limine and at trial. *Id.* The Court pointed out that had the supervisor's testimony merely recited the findings presented in the laboratory report, it would have Confrontation Clause concerns because the supervisor would be testifying to findings made by a technician who was not available for cross-examination, but that it is not what happened. *Id.* Rather, the Court found that the supervisor's testimony was based on her conclusions, independent of the technician's and of the report itself. *Id.* Accordingly, the Court found no Confrontation Clause violation and no ineffective assistance of counsel. *Id.*

These cases teach us that the State can avoid any Confrontation Clause problem by asking the testifying analyst to retest and then testify to the result of the retest, rather than to the results of the first test. *Fulton*, 353 S.W.3d at 456 (citing *Bullcoming v. New Mexico*, 564 U.S. 647, 666, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011)). The analyst can testify to his own independent opinions and conclusions about underlying testimonial reports them-

selves that are not admitted into evidence. *Fulton*, 353 S.W.3d at 456-57 (citing *Bullcoming*, 564 U.S. at 673, 131 S.Ct. 2705 (Sotomayor, J., concurring)).

Turning to the case at hand, Ivy argues that laboratory reports, such as the one prepared by the first examiner and reviewed by the State's expert in reaching her opinion, are testimonial in nature and that the Confrontation Clause barred admission of the report and testimony about conclusions made in it, or based upon that report. There is a major flaw in this argument: no laboratory report was admitted into evidence, not one by the State's expert nor one by the first examiner who did not testify at trial. Rather, the State's expert provided opinion testimony based upon her own independent analysis and Ivy had the opportunity to cross-examine her. Like in *Littleton*, we find this significant. See 372 S.W.3d at 931.

Another problem with Ivy's argument is that the defense did not object to the State's expert's testimony about the first examiner's findings. Prior to the State's expert's testimony, the defense objected to the witness testifying, arguing that the witness did not perform the analysis. The State argued that the witness performed her own analysis. The court allowed the witness to testify and indicated it would rule on Ivy's objection after it heard whether the witness performed her own analysis. Here is the relevant colloquy:

Q. And referring to the contents of [the palm print lift], have you had occasion to examine that?

A. Yes, I have.

Q. What did you do in your examination?

A. Another examiner . . . had looked at it first, and then I did the verification on it. So I—we did the entire process over and verified what she had and came up with an—came up with hers—with the same results. I also initialed on the back.

Q. So when you say you verified it, you conducted a start to finish examination on your own?

A. Yes.

Q. And that verified what [the first examiner] had found, correct?

A. Correct.

Q. So what is it that you did to come to that—to your conclusion as to whose prints those were?

A. When she initially did it she had ran or scanned this lift card into AFIS, which is the Automatic Fingerprint Identification System, and then—

[Defense Counsel]: Your Honor, I object to any testimony about what [the first examiner] did pursuant to the confrontation clause.

Q. (By [the State]) Did you have—let me withdraw the question.

THE COURT: Rephrase.

Q. (By [the State]) Did you have occasion to examine known fingerprints of Michael Ivy?

A. Yes, I have.

Q. Okay. And how did you do this comparison?

A. With a magnifying glass.

Q. Walk us through what you did.

A. We'll put the known print and then the latent print next to each other and you look at individual characteristics: ending ridges, bifurcations, dots. And then you look at each one on—each, side by side, and then go like—go from one ridge ending to the next and count over, and then see how many examination points you have in common and—before you say that is an identification.

Q. And were you able to make an identification of [the palm print lift]?

A. Yes.

We agree that the expert should not have testified to the first examiner's opinions. See, e.g., *State v. Bell*, 274 S.W.3d 592, 595-96 (Mo. App. W.D. 2009) (finding it error for chief medical examiner to testify as to the conclusions of the doctor who conducted the autopsy). But we can find no error by the trial court when no objection was made to the expert's reference to the first examiner's opinion. See, e.g., *State v. Walden*, 861 S.W.2d 182, 187 (Mo. App. W.D. 1993) (noting that failure to object to testimony at trial does not properly preserve error for appeal); *State v. Mahany*, 748 S.W.2d 762, 766 (Mo. App. E.D. 1988) ("The failure to object to an argument or statement at the time it is made to the jury waives any right to complain about the argument or statement on appeal.").

We find it was proper for the State's expert latent print examiner to testify about the conclusions that she reached regarding the prints based upon her own examination. See *Fulton*, 353 S.W.3d at 456 (citing *Bullcoming*, 564 U.S. at 666, 131 S.Ct. 2705); *Sauerbry*, 447 S.W.3d at 789 (rejecting defendant's argument that expert testimony relying on observations made by another pathologist who performed the deceased's autopsy violated the Confrontation Clause because the expert testified to her own opinions and her testimony did not merely serve as a conduit for the transmission of the pathologist's observations.).

■ Furthermore, to the extent that any error occurred, it was harmless because no report was offered or admitted into evidence, the expert testified to her own conclusions, and the evidence was cumulative. See *Bell*, 274 S.W.3d at 595-96 (finding that to the extent the examiner testified to the doctor's opinions who conducted the autopsy was error and violated defendant's Confrontation Clause rights, but finding the error harmless because the autopsy report was never offered or admitted into evidence, the examiner testified to his own conclusions, and the evidence was cumulative); see also *Fulton*, 353 S.W.3d at 457 (finding no prejudice resulted from examiner's testimony who did not perform autopsies but reviewed them where the State neither offered nor admitted nontestifying examiner's autopsy report into evidence); *State v. Davidson*, 242 S.W.3d 409, 417-18 (Mo. App. E.D. 2009) (finding that admission of other medical examiner's testimony and autopsy report violated the Confrontation Clause, but concluding that it was harmless error because the jury would have found that the victim died from a gunshot wound even if the evidence had been excluded).

Indeed, the State did not solely rely on the first examiner's conclusion that Ivy's left palm print matched the print lifted from the counter at the 7-Eleven to convict Ivy of the July 5th robbery. To the contrary, the State also relied on the testifying examiner's own testimony matching Ivy's prints, surveillance video of the July 5th robber, and witness testimony identifying the gun found with Ivy when he was arrested on July 13th as the gun used during the July 5th robbery. Thus, the evidence was cumulative and " '[e]vidence challenged on constitutional grounds that is cumulative of other, properly admitted evidence cannot have contributed to a defendant's conviction and so is harmless beyond a reasonable doubt.' " *Bell*, 274 S.W.3d at 596 (quoting *Davidson*, 242 S.W.3d at 418); see also *State v. Bell*, 62 S.W.3d 84, 92 (Mo. App. W.D. 2001) ("[E]ven if her testimony as to the results of the first comparison was erroneously admitted, it was merely cumulative of her properly admitted testimony concerning the second comparison"). Point III is denied.

### IV. Foundation for Ivy's Standard Prints

█ In point IV, Ivy contends that the trial court abused its discretion in allowing the latent print examiner to testify that the print lifted from the counter at the 7-Eleven on July 5th matched Ivy's left palm print because a proper foundation had not been made for Ivy's prints the police had on file. The State asserts that a proper foundation was made. We find that the trial court did not abuse its discretion in allowing the testimony.

█ The comparison of fingerprints is a proper matter for an expert witness. *State v. Phillips*, 511 S.W.2d 841, 844 (Mo. 1974). " 'An expert witness is entitled to rely on hearsay evidence to support his opinion so long as that evidence is of the type reasonably relied upon by other experts in that field; such evidence need not be independently admissible.' " *State v. Tillman*, 289 S.W.3d 282, 288 (Mo. App. W.D. 2009) (quoting *State v. Hendrix*, 883 S.W.2d 935, 940 (Mo. App. W.D. 1994)). Expert print comparison testimony can be considered like any other testimony by the jury which can weigh and credit the testimony as it sees fit. *State v. Maxie*, 513 S.W.2d 338, 345 (Mo. 1974). We review a trial court's decision to admit or exclude testimony for an abuse of discretion. *Tillman*, 289 S.W.3d at 288.

Here, there was no dispute on the qualifications of the expert latent print examiner and it is undisputed that Ivy's known prints were not offered or admitted into evidence. Thus, the only issue is whether the expert could testify about the hearsay print evidence to support her opinion it matched the print admitted into evidence without objection. The trial court did not abuse its discretion in admitting this testimony.

First, the expert testified, without objection, that she examined known fingerprints of Ivy and compared them to the latent print lifted from the 7-Eleven counter. It was not until the State asked the expert about the results of her analysis that the defense objected. By this point it was too late. See *Mahany*, 748 S.W.2d at 766 ("[I]f an objection is not timely made, the trial court has no opportunity to take corrective action."); *State v. Umfleet*, 587 S.W.2d 612, 617 (Mo. App. E.D. 1979) ("An appellant waives his right to have testimony excluded from evidence when he fails to object to prior testimony of the same tenor when it is first given.").

And in any event, this was the type of hearsay evidence reasonably relied upon by latent print examiner experts and was proper for the expert to rely upon in giving her opinion. See *State v. Hightower*, 511 S.W.3d 454, 460 (Mo. App. E.D. 2017) (noting that the vast majority of courts have found print examination admissible and finding no error in admitting fingerprint identification expert testimony). Moreover, the defense was able to cross-examine the expert about the known print and the jury was able to weigh and credit the testimony as it saw fit. *Maxie*, 513 S.W.2d at 345. Point IV is denied.

### Conclusion

For the reasons stated above, we affirm the judgment of the trial court.

Lisa P. Page, P.J. and Roy L. Richter, J. concur.